**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BROWNSVILLE MD VENTURES,** | § | **CASE NO. 13-10341** |
| **LLC,** | § | |
| | § | **CHAPTER 11** |
| **DEBTOR.** | § | |

**BROWNSVILLE MD VENTURES, LLC'S
SECOND AMENDED DISCLOSURE STATEMENT FOR ITS
<u>FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION</u>**

Date:  February 27, 2014

HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 472-5456
(512) 226-7324 (fax)
kell.mercer@huschblackwell.com
sam.chang@huschblackwell.com


By:  *<u>/s/ Kell C. Mercer</u>*
     Kell C. Mercer
     State Bar No. 24007668
     Sam Chang
     State Bar No. 24078333

ATTORNEYS FOR BROWNSVILLE MD
VENTURES, LLC

1

## IMPORTANT NOTICE

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT INCLUDES FORWARD-LOOKING STATEMENTS BASED LARGELY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR OR THE REORGANIZED DEBTOR'S BUSINESS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER THE CAPTION "RISK FACTORS."  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  NEITHER THE DEBTOR NOR THE REORGANIZED DEBTOR UNDERTAKE ANY OBLIGATIONS TO UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.**

**NO REPRESENTATIONS OR OTHER STATEMENTS CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS ASSETS) ARE AUTHORIZED BY THE DEBTOR, OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE, WHICH ARE OTHER THAN AS SET FORTH IN THIS STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISIONS.  ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT, WHICH MAY TAKE SUCH ACTION AS IT DEEMS APPROPRIATE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED, EXCEPT AS SPECIFICALLY REFERENCED HEREIN.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTOR AND ITS INTERNAL ACCOUNTING STAFF, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. THE DEBTOR'S PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH CREDITOR IS URGED TO REVIEW THE PLAN IN ITS ENTIRETY PRIOR TO VOTING ON IT.**

AUS-5948111-1 6061534/1

**THE DEBTOR MAKES NO REPRESENTATIONS WITH RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE INTEREST HOLDERS OR CREDITORS WITH RESPECT TO THE TREATMENT OF THEIR CLAIMS OR INTERESTS UNDER THE PLAN, AND NO SUCH REPRESENTATIONS ARE AUTHORIZED BY THE DEBTOR.  CREDITORS AND INTEREST HOLDERS ARE ENCOURAGED TO SEEK THE ADVICE OF THEIR OWN PROFESSIONAL ADVISORS IF THEY HAVE ANY SUCH QUESTIONS.**

AUS-5948111-1 6061534/1

# I.  INTRODUCTION

This Second Amended Disclosure Statement ("Disclosure Statement") is submitted by Brownsville MD Ventures, LLC (the "Debtor") in connection with the Debtor's efforts to solicit votes necessary to confirm the Debtor's First Amended Chapter 11 Plan of Reorganization (the "Plan").  A copy of the Plan is included with the materials supplied in the packet you have received, and is attached as an exhibit to this Disclosure Statement.

## 1.01    Filing of the Debtor's Chapter 11 Case

On August 26, 2013, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Brownsville Division ("Bankruptcy Court").  The Debtor continues to manage its affairs as a debtor-in-possession pursuant to Sections 1107 and 1008 of the Bankruptcy Code.  This Disclosure Statement and the accompanying Plan are filed on behalf of the Debtor.

## 1.02    Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to provide you, as the holder of a Claim against the Debtor, with information to enable you to make a reasonably informed decision on the Plan before exercising your right to vote to accept or reject the Plan.[1]

On January 8, 2014, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information, of a kind and in sufficient detail, adequate to enable the holders of Claims against the Debtor to make an informed judgment to accept or reject the Plan.  **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THIS INFORMATION OR THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN.**

**YOU SHOULD READ ALL OF THIS DISCLOSURE STATEMENT BEFORE VOTING ON THE PLAN.  HOWEVER, THE DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL, DETAILED REVIEW AND ANALYSIS OF THE PLAN ITSELF BY EACH HOLDER OF A CLAIM OR INTEREST.  THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW AND ANALYSIS.  THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS IN THEIR ENTIRETY FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

---

[1]    Capitalized terms that are not defined in the Disclosure Statement are defined in the Plan

4

You are urged to consult with your own financial and other advisors in deciding whether to vote to approve or reject the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning the Debtor or their businesses other than the information contained in this Disclosure Statement.

About this Disclosure Statement:

▪       The statements contained in this Disclosure Statement are made as of the date that the Bankruptcy Court enters an order approving this Disclosure Statement, unless another time is specified in this Disclosure Statement.  Neither the delivery of this Disclosure Statement nor any action taken in connection with the Plan implies that the information contained in this Disclosure Statement is correct as of any time after that date.

▪       Unless the context requires otherwise:  (i) the gender (or lack of gender) of all words used in this Disclosure Statement includes the masculine, feminine, and neuter; (ii) references to articles and sections (other than in connection with the Bankruptcy Code, the Bankruptcy Rules, another specified law or regulation or another specified document) refer to the articles and sections of this Disclosure Statement; and (iii) "including" means "including, without limitation."

▪       Many capitalized words used in this Disclosure Statement have been defined in the context of the provisions in which they first appear within this Disclosure Statement.  Any other capitalized terms used in this Disclosure Statement are intended to have the meanings ascribed to them in the Plan.  Any capitalized term not defined in the context of a provision in this Disclosure Statement or in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

▪       You may not rely on this Disclosure Statement for any purpose other than to determine how to vote on the Plan.  Nothing contained in this Disclosure Statement constitutes or will be deemed to be advice on the tax or other legal effects of the Plan on holders of Claims or interests.

▪       Certain information contained in this Disclosure Statement is forward-looking. This Disclosure Statement contains estimates and assumptions that may prove not to have been accurate, and it contains financial projections that may be materially different from actual future experiences.

▪       Acceptance or rejection of the Plan is subject to a number of risks.  See "Risk Factors" in Section 9 of this Disclosure Statement.

## 1.03    Plan Balloting and Confirmation Procedures

### 1.03.01            Holder of Claims and Interests Entitled to Vote

Only Classes of Claims and interests that are (i) "impaired" by a plan of reorganization or liquidation and (ii) entitled to receive a distribution under such a plan are entitled to vote to

accept or reject a plan under the Bankruptcy Code.  In this case, only holders of Claims and Interests in Classes 1 through 4 are impaired, or possibly impaired, by the Plan and entitled to vote to accept or reject the Plan.

**1.03.02**        **Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot (the "Ballot") for acceptance or rejection of the Plan and a pre-addressed envelope for return of the Ballot are enclosed.  BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS AND INTERESTS IN CLASSES ONE THROUGH FOUR BECAUSE THOSE CLASSES CONTAIN ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN.  If you are the holder of a Claim in one of these Classes entitled to vote and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party-in-interest and have any questions concerning the Disclosure Statement, the Plan, or the voting procedures, please contact:

> Kell C. Mercer
> State Bar No. 24007668
> Sam Chang
> State Bar No. 24078333
> HUSCH BLACKWELL LLP
> 111 Congress Ave., Suite 1400
> Austin, Texas 78701
> (512) 472-5456
> (512) 226-7324 (fax)
> kell.mercer@huschblackwell.com
> sam.chang@huschblackwell.com

After carefully reviewing this Disclosure Statement, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.  Return the Ballot to the Debtor's counsel at the address set forth on the Ballot by **5:00 p.m.** (prevailing Central Standard Time) on March 28, 2014.  You may also return your Ballot by courier or fax by following the instructions on the Ballot.  Any Ballot not indicating an acceptance or rejection will be deemed an acceptance of the Plan.  **ANY BALLOTS RECEIVED BY THE DEBTOR'S COUNSEL AFTER 5:00 P.M. (PREVAILING CENTRAL STANDARD TIME), ON MARCH 28, 2014, WILL NOT BE COUNTED UNLESS THIS DATE IS EXTENDED BY THE BANKRUPTCY COURT.**

**1.03.03**        **Voting Requirements for Class Acceptance of the Plan**

In order for the Plan to be "accepted" by Creditors and interest holders, at least sixty-six and two-thirds percent (66.66%) in amount of Allowed Claims and more than fifty percent (50%) in number of Allowed Claims voting in each Class must accept the Plan.

AUS-5948111-1 6061534/1

### 1.03.04          Confirmation Hearing

The Bankruptcy Court has entered an order fixing **April 1, 2014, at 10:00 a.m.** (Prevailing Central Standard Time), Bankruptcy Courtroom for the Honorable Richard Schmidt, United States Bankruptcy Court in the Southern District of Texas, Corpus Christi Division, 1133 North Shoreline Boulevard, Corpus Christi, Texas 78401, as the date, time and place for the initial commencement of a hearing on confirmation of the Plan, and **March 28, 2014, at 5:00 p.m.**, as the time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on counsel for the Debtor. The confirmation hearing may be adjourned from time to time without further notice except for the announcement of the adjourned time and date at the confirmation hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court; (iii) set forth the name of the objecting party; (iv) the nature and amount of the Claim or Interest held or asserted by the objecting party against the Debtor's Bankruptcy Estate; and (v) the basis for the objection. The objection, together with proof of service, must then be filed with the Bankruptcy Court, with copies served upon parties required to receive service under Local Rule 9013-1(d), and to the Debtor's counsel at:

> Kell C. Mercer
> State Bar No. 24007668
> Sam Chang
> State Bar No. 24078333
> HUSCH BLACKWELL LLP
> 111 Congress Ave., Suite 1400
> Austin, Texas 78701
> (512) 472-5456
> (512) 226-7324 (fax)
> kell.mercer@huschblackwell.com
> sam.chang@huschblackwell.com

**UNLESS AN OBJECTION IS TIMELY AND PROPERLY SERVED AND FILED BY MARCH 28, 2014, AT 5:00 P.M. (PREVAILING CENTRAL STANDARD TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## II.  DEBTOR'S BACKGROUND AND FINANCIAL PICTURE

### 2.01          General

The Debtor is a Texas limited liability company whose managing member is Chester Gonzalez. The members of the Debtor are:

7

| Member | Percentage of Membership Interest |
|---|---|
| Chester R. Gonzalez | 5% |
| Bradley W. Nordyke | 10% |
| Guajardo Family Limited Partner | 5% |
| Lomix Limited Partnership | 5% |
| Asim Zamir | 5% |
| Sanchez Family Limited Partnership | 5% |
| C. Lynn Anderson | 15% |
| Charles Zavala | 10% |
| Robert Lekach | 5% |
| Valley Recruitment Agency, Inc. | 10% |
| Vicki Miles Rodriguez | 7.5% |
| Lapacho, Ltd. | 5% |
| Dominguez Family Partnership, LTD | 5% |
| Brownsville Doctors Hospital, LLC | 7.5% |

**2.02        History of Debtor, Marketing of the Property, and Causes of Bankruptcy Filing**

**A.        General History**

The Debtor was formed on April 22, 2004, for the purpose of acquiring the real property and improvements located at 4750 North Expressway, Brownsville, Texas 78520 (the "Property").  In order to finance the acquisition of the Property, the Debtor executed a promissory note in favor of Compass Bank.  As part of the financing transaction, the Debtor executed a deed of trust regarding the Property, and Compass Bank was named a beneficiary under this deed of trust.  Subsequently, Pineda Grantor Trust II was assigned Compass Bank's interest in the promissory note and deed of trust regarding the Debtor.  Upon information and belief, Pineda Grantor Trust II received the promissory note and deed of trust at a substantial discount from the face value of the promissory note.  Moreover, Pineda Grantor Trust II accepted the deed of trust with full knowledge of the condition of the Property.

The Debtor leased the Property to Brownsville Doctors Hospital, LLC (the "Tenant"). The Tenant operated a hospital on the premises of the Property.  In August 2012, the Tenant ceased hospital operations on the premises of the Property.  In ceasing hospital operations, the Tenant laid off its employees, and the Tenant vacated the Property.  The Property has been vacant since August 2012.

**B.        Pre-Petition Marketing of the Property**

Prior to the Debtor's bankruptcy filing, the Debtor marketed the Property for sale.  The Debtors engaged in discussions with several potential purchaser of the Property.  The potential purchasers and the proposed terms of the sale are:

▪ One potential purchaser initially offered $14,700,000.00 for the Property, and executed a sales contract with the Debtor.  Eventually, the terms of the sale were that this

8

purchaser would pay the Debtors $3,000,000.00 in cash, and negotiate a payoff with BBVA Compass Bank, the original lienholder of the Property.

- Another potential purchaser entered into a letter of intent for the Property, and it made an initial offer to purchase the Property for $12,000,000.00 and a subsequent offer of $10,000,000.00.    The Debtor made a counteroffer to sell the Property for $14,354,000.00.

- One of the members of the Debtor and the Debtor engaged in negotiations regarding the purchase of the Property.  This member offered to purchase the Property for $3,000,000.00 payment to the Debtor, and a negotiated payoff with BBVA Compass Bank.  The Debtor made a counteroffer to sell the Property for $15,000,000.00.

- Another potential purchaser offered to purchase the Property for $10,000,000.00.  The Debtor did not accept this offer, but the Debtor did make a counteroffer to sell the Property for $14,354,000.00.

- A hospital and the Debtor entered into a letter of intent regarding the lease and potential purchase of the Property.

None of these discussions or agreements resulted in the sale of the Property.

## C.      The Federal Court Lawsuit

On August 27, 2012, certain ex-employees of the Tenant brought a lawsuit against the Tenant and the Debtor, asserting that the Tenant and the Debtor violated the required 60-day notice provision of the WARN Act, 29 U.S.C. § 2101 *et seq.* (the "Federal Court Lawsuit").[2] The Tenant's ex-employees amended their complaint.  In their amended complaint, the ex-employees asserted that the Debtor exercised de facto control over the Tenant because of certain provisions of the lease between the Debtor and the Tenant, and because of some overlap among individuals associated the Debtor and the Tenant.  The Debtor has denied that it is liable to the Tenant's ex-employees, either individually or vicariously through the Tenant, for WARN Act violations.

The Federal Court Lawsuit, combined with the fact that the Debtor did not have a tenant in the Property, put strain on the Debtor's finances.  As a result, the Debtor was having difficulty in making its scheduled payments to Pineda Grantor Trust II, and in making payments to its other creditors.  The Debtor filed its bankruptcy petition on August 26, 2013. The Debtor believes that the value received for the sale of the Property will be maximized in a Chapter 11 case, as opposed to a foreclosure.

---

[2]      The Federal Court Lawsuit is styled *Martinez v. Brownsville Doctors Hospital, LLC et al.*, Case No. 1:12-cv-00167, in the United States District Court for the Southern District of Texas, Brownsville Division.

## III.  FINANCIAL INFORMATION AND VALUATION

### 3.01          General

This section provides summary financial information concerning the Debtor, its assets and potential sources of recovery for creditors. The information is based on information available as of the date of this Disclosure Statement. Any forward-looking projections, including analysis and valuation of Litigation Claims, is based upon the Debtor's best estimates and belief but, as with any projections, may vary in the future.

### 3.02          Operating Performance

Because the Property is not occupied by a tenant, the Debtor does not have rental income. The Debtor's monthly operating income consists of interest that accrues on its checking account at Capital One Bank.  The Debtor's monthly operating expenses consist of payments for utility services, and for insurance premium financing for the Property.

### 3.03          Valuation of the Property

The Property was appraised by Compass Bank in July of 2011 with a fair market value in excess of $20,000,000.  The Compass Bank valuation is attached as an exhibit to this Disclosure Statement.  In sum, the Property was valued "as is" at $20,750,000.00 and "prospective as complete" at $22,550,000.00.  As stated in pages 1-2 of the Compass Bank valuation, the valuation of the Property takes into account dehumidication issues, water leaks, and air conditioning issues regarding the Property.

Given this Compass Bank valuation, the Debtor believes that there is substantial equity in the Property.  The Debtor is in the process of obtaining an updated appraisal for Property.  The updated appraisal will be included with a supplement to this Disclosure Statement upon completion. The value of the Property is impacted by water leaks, as well as humidification and air conditioning issues.  However, these issues were present and recognized in the prior appraisal.

## IV.  PROCEEDINGS IN THE DEBTOR'S BANKRUPTCY CASE

### 4.01          Commencement and Administration of the Case

The Debtor's Chapter 11 bankruptcy case was commenced August 26, 2013.  The Debtor's Chapter 11 bankruptcy case is designated as a single asset real estate case.  The following is a description of the more significant matters to have come before the Court.

### 4.02          Agreed Interim Orders Regarding the Debtor's Use of Cash Collateral

The Debtor and Pineda Grantor Trust II reached four interim agreements regarding the interim use of cash collateral.  The Debtor was permitted to use cash collateral to pay:

10

(i) a one-time adequate assurance security deposit in the amount of $25,000.00 to the Brownsville Public Utilities Board, the Debtor's utilities provider; (ii) post-petition monthly utility bills, in the estimated amount of $16,000.00 per month; and (iii) a monthly insurance premium financing payment for the Debtor's real property in the amount of $11,890.53. The Debtor's interim use of cash collateral expires on January 22, 2014, at which time a final hearing is scheduled for the Debtor's use of cash collateral.

**4.03          Adequate Protection to the Utility Services Provider**

The Debtor and the Brownsville Public Utilities Board, its utilities provider, have agreed to a procedure regarding adequate protection.   Under this procedure, the Debtor made a security deposit payment of $25,000.00 to the Brownsville Public Utilities Board. This $25,000.00 security deposit is to be adjusted upwards or downwards to match the average monthly invoice for the period of August 2013 through May 2014.

Additionally, any post-petition utilities provided to the Debtor are to be given administrative expense priority under Sections 503(b)(1)(a) and 507(a)(2) of the Bankruptcy Code.   Should the Debtor default in paying any post-petition invoices, the Brownsville Public Utilities Board shall issue a default notice and mail it to the Debtor, per applicable state law procedures.   If the Debtor does not cure in full its default, then the Brownsville Public Utilities Board may proceed with terminating the utility services provided to the Debtor without the Court's permission.

**4.04          Approval of Employment of Husch Blackwell LLP as Debtor's Bankruptcy Counsel**

Husch Blackwell LLP serves as the Debtor's bankruptcy counsel.   As a professional under Section 327 of the Bankruptcy Code, the firm is entitled to seek interim and final compensation from the Debtor's Bankruptcy Estate upon a duly noticed application and after a hearing before the Court.

**4.05          Approval of Employment of The Rentfro Law Firm PLLC as Debtor's Special Counsel**

The Rentfro Law Firm PLLC serves as the Debtor's special counsel under Section 327(e) of the Bankruptcy Code.   The firm is  employed to provide legal advice regarding business matters.

**4.06          Obtaining Replacement Insurance and Entering into Post-Petition Insurance Premium Financing**

As part of the Tenant's obligations under its lease for the Property, the Tenant was required to maintain property insurance covering the Property.   The Tenant obtained a policy from Union Standard Insurance Company (the "Policy" and the "Insurer," respectively).   The Debtor was listed as an additional named insured under the Policy.

11

In the Spring of 2013, the Debtor learned that the Tenant was unable to make its monthly insurance premium financing payments for the Policy.  Beginning in April 2013 and continuing thereafter, the Debtor paid the Tenant's monthly premium financing payments directly in order to prevent the Policy from lapsing.

After the Debtor's bankruptcy case was commenced, the Debtor learned that, notwithstanding the direct payments made by the Debtor and the Insurer's acceptance of such payments, the Insurer provided noticed to the Tenant in April 2013 that the Policy was purportedly being terminated.  The Debtor maintains that the alleged termination was invalid and that coverage remains in place due to the acceptance of payments by the Insurer.

Nevertheless, upon the Debtor learning that the Insurer terminated the Policy, the Debtor began searching for a replacement insurance policy for the Property.  On December 13, 2013, after shopping the policy, the Debtor submitted an application for a binding insurance quote.  On January 10, 2014, the Debtor received a binding quote for a replacement policy, and on January 13, 2014, the Debtor submitted a final application for insurance based on this binding quote.  After submitting this final application, the Debtor found an insurer willing to issue a replacement policy for the Property.  The premium for this replacement policy was $87,062.71, payable with an initial down payment of $22,853.23 and ten (10) monthly payments of $6,654.25.  Additionally, the insurance premium financing company was to be granted a first priority security interest in first priority security interest in (i) all unearned premiums which may be payable under the replacement policy; (ii) loss payments which reduce the unearned premiums, and (iii) any interest arising under a state guarantee funding relating to (i) and (ii).  The insurer was willing to issue a replacement policy for the Property, subject to the Court's approval of the insurance premium financing.

On January 14, 2014, the Court heard, on an emergency basis, the Debtor's *Emergency Motion to Obtain Post-Petition Insurance Premium Financing* [Docket No. 86].  The Court subsequently authorized the Debtor to obtain post-petition insurance premium financing under the terms stated above.  On January 28, 2014, the Debtor obtained a replacement insurance policy for the Property, with the policy being effective January 10, 2014.  Both Pineda Grantor Trust II and the U.S. Trustee were added as notice parties to this policy.

### 4.07          Motion to Lift the Automatic Stay

The Pineda Grantor Trust II filed motions to lift the automatic stay on the ground that there was allegedly no insurance coverage on the Property.  Eventually, the Debtor and Pineda Grantor Trust II entered into an *Agreed Order* [Docket No. 92] whereby the automatic stay was modified to permit the Pineda Grantor Trust II to commence foreclosure proceedings and to foreclose on the Property, unless the Debtor provides proof of insurance to the Pineda Grantor Trust II within fourteen (14) days of the entry of the *Agreed Order*.  Additionally, the Pineda Grantor Trust II and the U.S. Trustee are required to be added as notice parties under the replacement policy for the Property.

## V. SUMMARY OF THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

### 5.01       Explanation of Chapter 11 of the Bankruptcy Code

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a plan proponent, typically the debtor, attempts to restructure a debtor's financial affairs or effectively liquidate the debtor's assets for the benefit of the debtor's creditors, equity interest holders, and other parties-in-interest.  The Chapter 11 plan of reorganization is a debtor's agreement with its creditors.  The Chapter 11 plan of reorganization contains the terms and conditions for the operation and/or liquidation of a debtor's assets of the debtor, and the treatment of the Claims and interests of creditors and parties-in-interest.

Under Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 plan of reorganization may be solicited by the debtor only after a written disclosure statement approved by a bankruptcy court as containing adequate information has been provided to each creditor or equity interest holder.

### 5.02       Terms of the Plan Control

The following represents the Debtor's best efforts to describe the treatment afforded the Claims of the Creditors in various Classes.  Creditors should be aware that the terms of the Plan control the treatment of all Claims.  In the event of any inconsistencies between the Plan and this Disclosure Statement, the terms of the Plan shall be, in all events, determinative. The Debtor urges all Creditors to read the Plan for a complete understanding of the treatment of their Claims.

### 5.03       Classification of Claims and Interests and Treatment

Administrative Claims:

Each holder of an Allowed Administrative Claim shall receive from the Debtor either: (i) the amount of such Allowed Administrative Claim in one Cash payment on Effective Date or (ii) such other treatment as may be agreed upon in writing by the Debtor and the holder of the Allowed Administrative Claim.  An Allowed Administrative Claim representing a liability incurred in the ordinary course of business of the Debtor shall be paid by the Debtor upon presentment or otherwise in accordance with the terms of the particular transaction and any agreements relating thereto.

### a.       Administrative Claim Bar Date and Administrative Claim Objection Deadline

The Plan constitutes a motion to fix and establish an administrative bar date of thirty (30) days following the Confirmation Date.  Upon entry of the Confirmation Order, the Debtor shall provide notice of such Administrative Claim Bar Date to every Person that may assert an Administrative Claim against the Debtor.  Applications for compensation and reimbursement filed by professionals employed under Section 327 of the Bankruptcy Code shall be filed

13

no later than thirty (30) days after the Confirmation Date or by a date set by the Bankruptcy Court.  All other requests for payment of Administrative Claims shall be filed by the earlier of thirty (30) days after the Confirmation Date, or by a date set by the Bankruptcy Court.

The Plan also constitutes a motion to fix and establish a deadline to object to timely filed Administrative Claims, such deadline being thirty (30) days following the Administrative Claim Bar Date.

### b.        Administrative Claim Reserve

On the Effective Date, the Reorganized Debtor will fund the Administrative Claim Reserve in an amount sufficient to pay all Allowed Administrative Claims in full (other than those Administrative Claims to be paid in the ordinary course of business of the Reorganized Debtor).  The funds in the Administrative Claim Reserve shall be released and paid over to those holders of Allowed Administrative Claims.  Any funds remaining in the Administrative Claim Reserve following payment of All Allowed Administrative Claims shall be released to the Reorganized Debtor for further use in accordance with the Plan.

### c.        Claims of Professional Bar Date and Claims of Professional Objection Deadline

Any Claims of Professionals approved by the Court, and not previously paid pursuant to any orders approving such payments, shall be paid in Cash in such amounts as are Allowed by Final Order of the Court:  (i) within five (5) days following the date such Claim of a Professional becomes an Allowed Administrative Claim or (ii) upon such other terms as may be mutually agreed upon between the holder of a Claim for Professional Fees and the Reorganized Debtor.

The Plan constitutes a motion to fix and establish a bar date of thirty (30) days after the Confirmation Date for the filing of final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.    All Professionals seeking compensation for unpaid services rendered or reimbursement of expenses incurred through and including the Confirmation Date shall file their respective applications no later than such date as set forth in this Section.  Upon entry of the Confirmation Order, the Debtor shall provide notice of such Professionals Bar Date to every Person that may assert a Claim for Professional fees against the Debtor.

This Plan constitutes a motion to fix and establish a deadline to object to timely filed Claims of Professionals, such deadline being thirty (30) days following the Professionals Bar Date.

### d.        Professionals Account and United States Trustee Fees

On the Effective Date, the Reorganized Debtor will fund the Professionals Account in an amount sufficient to pay all Allowed Claims of Professionals in full.  Additionally, all fees owing to the United States Trustee pursuant to 28 U.S.C. § 1930 shall be paid by the Reorganized Debtor in Cash as such fees become due.

14

<u>Class 1:  Claim of Cameron County</u>.

This Class shall consist of the Claim of Cameron County

**a.      Treatment**

Cameron County shall be paid in full on account of its Allowed Claim by the earlier of the sale of the Property and August 26, 2018.  Interest shall accrue on Cameron County's Allowed Claim at the rate of 12% per year, pursuant to Section 506(b) of the Bankruptcy Code, which incorporates Section 33.01 of the Texas Tax Code.  Monthly payments on account of Cameron County's Allowed Claim shall begin on the later of the first day of the first month following the Effective Dates and the date Cameron County's Claim is Allowed.  The payment schedule shall consist of equal monthly payments, amortized over the number of months between the Effective Date and August 26, 2018, or as otherwise agreed.  In the event the Property is sold by the Outside Date, Cameron County's remaining Allowed Claim shall be paid, in full, at closing.  In the event the Property is not sold by the Outside Date, the Property shall be transferred to Pineda Grantor Trust II subject to Cameron County's Lien, which shall remain until Cameron County's Allowed Claim is paid in full.

**b.      Funding**

The funds necessary to make payments under the Plan on Cameron County's Allowed Claims shall come from Cash on hand as of the Effective Date, with Cash realized from the return of funds held on deposit by Pineda Grantor Trust II, and by selling the Property if such a sale can be realized by the Outside Date.

**c.      Impairment & Voting**

Class 1 is impaired.   Acceptance of this Plan from Cameron County will be solicited.

<u>Class 2:  Claim of Pineda Grantor Trust II</u>

This class shall consist of the Claim of Pineda Grantor Trust II.  Class 2 is impaired.

**a.      Treatment**

The Allowed Claim of Pineda Grantor Trust II, together with interest accruing after the Effective Date at 4% or such other rate as set by the Bankruptcy Court not to exceed 6%, shall be satisfied, either through a sale of the Property by the Outside Date, or if the Property has not been sold by the Outside Date, by tendering the Property to Pineda Grantor Trust II on the Outside Date free and clear of all Liens, claims, and encumbrances, except for the Lien of Cameron County.  Pineda Grantor Trust II shall retain its Liens until paid in full.

**b.      Funding**

The funds necessary to make payments under the Plan on Pineda Grantor Trust II's Allowed Claim shall come from the sale of the Property, if realized by the Outside Date,

following payment in full of Cameron County's Allowed Claim. The Debtor denies that Pineda Grantor Trust II has an interest in cash collateral. To the extent that the sale proceeds of the Property do not pay Pineda Grantor Trust's Allowed Claim in full, the deficiency amount shall be placed in Class 3, along with the Claims of General Unsecured Creditors.

In the event the sale of the Property does not occur by the Outside Date, Pineda Grantor Trustee shall receive title to the Property free and clear of all Liens, claims, and encumbrances except for the Lien of Cameron County.

### c.    Impairment & Voting

Class 2 is impaired. Acceptance of this Plan from Pineda Grantor Trust II will be solicited.

Class 3:  Claims of General Unsecured Creditors

This class shall consist of the Claims General Unsecured Creditors.

### a.    Treatment

Holders of Allowed General Unsecured Creditors have the potential for payment, in full, of their Allowed Claims if the Property is sold by the Outside Date. Additionally, holders of Allowed General Unsecured Claims shall receive their pro rata share of any recoveries on Causes of Action, including Avoidance Actions.

### b.    Funding

If the Reorganized Debtor does sell the Property by the Outside Date, the proceeds will be distributed first to pay the Allowed Claim of Cameron County, then the Allowed Claim of Pineda Grantor Trust, then to the holders of Allowed General Unsecured Claims, with any surplus to be distributed to the Equity Trust for distribution per its terms. If the Reorganized Debtor does not sell the Property by the Outside Date, Holders of Allowed General Unsecured Creditors shall receive their pro rata share of any recoveries on Causes of Action, including Avoidance Actions brought by the Reorganized Debtor.

### c.    Impairment & Voting

Class 3 is impaired. Acceptance of this Plan from holders of Class 3 Claims will be solicited.

Class 4:  Equity Interests

This Class shall consist of holders of Equity Interest in the Debtor.

16

### a.      Treatment

Holders of Equity Interests in the Debtor shall place their interests into the Brownsville MD Ventures Equity Trust, and pursuant to this Plan, shall not receive any payments or distributions on account of those interests until all senior classes are paid in full.  Should the Reorganized Debtor not sell the Property by the Outside Date, all Equity Interests will then be terminated along with the Brownsville MD Ventures Equity Trust.

### b.      Impairment and Voting

Class 4 is impaired.  Acceptance of this Plan from holders of Class 4 Interests will be solicited.

### 5.04      Discharge of Claims

The Debtor will not be seeking a discharge under Section 1141 of the Bankruptcy Code.  Pursuant to Section 1141(d)(3) of the Bankruptcy Code, a discharge is unavailable to the Debtor because:  (i) the Plan provides for the liquidation of all or substantially all of the property of the Bankruptcy Estate; (ii) the Debtor will not engage in business after consummation of the plan; and (iii) the Debtor is not an individual.

On the Confirmation Date, all Liens against any assets and property, except for Liens as explicitly provided in the Plan, shall be deemed extinguished and discharged.  Any litigation, pending against the Debtor as of August 26, 2013, including the Federal Court Lawsuit, shall be deemed resolved and restructured by the provisions of this Plan, and shall be dismissed with prejudice immediately after the Effective Date.

## VI.  IMPLEMENTATION OF THE DEBTOR'S PLAN

### 6.01      Summary of Implementation of the Plan

The Plan contemplates either a sale of the Property by the Outside Date, or if the Property has not sold by the Outside Date, by tendering the Property to Pineda Grantor Trust II on the Outside Date free and clear of all Liens claims and encumbrances except for the Lien of Cameron County.  Should the Property be sold by the Outside Date, the sale proceeds will be used to pay: (i) the Allowed Claim of Cameron County, with interest at the rate required by Section 506(b) of the Bankruptcy Code and Section 33.01 of the Texas Tax Code, (ii) the Allowed Claim of Pineda Grantor Trust II, with interest accruing after the Effective Date at 4% or such other rate as set by the Bankruptcy Court not to exceed 6%, by the Outside Date; (iii) Allowed General Unsecured Claims; and any surplus to (iv) Equity Interests.  Should the Reorganized Debtor not sell the Property by the Outside Date, the Reorganized Debtor will convey ownership the Property to Pineda Grantor Trust II in satisfaction of the Allowed Claim of Pineda Grantor Trust II, and all Equity Interests will then be terminated along with the Equity Trust.  Cameron County shall retain its Lien until paid in full, notwithstanding the transfer of the Property to Pineda Grantor Trust II.

AUS-5948111-1 6061534/1

The Reorganized Debtor will fund its Cash obligations under the Plan with Cash on hand, with Cash realized from the return of funds held on deposit by Pineda Grantor Trust II, and by selling the Property if such a sale can be realized by the Outside Date.

The Reorganized Debtor will market the Property for sale using commercially reasonable efforts.  To assist in the marketing and sale of the Property, the Reorganized Debtor will retain Eric Ziehe of NAI Rio Grande Valley LLC as a real estate broker.  NAI Rio Grande Valley LLC and Mr. Ziehe will be compensated for the marketing and sale of the Property by being paid a five percent (5%) commission of the sales price of the Property.  The proposed listing price for the Property will be between $15mm to $18mm.

Without limitation, Mr. Ziehe will implement and execute the following marketing efforts:

- Produce a detailed brief on the Property;
- Install signage on the Property;
- Prepare a marketing brochure;
- Distribute marketing brochures to a target list of buyers;
- Place marketing materials on relevant websites (e.g. LoopNet, CoStar, NAI Rio Grande Valley website);
- E-mail the Property prospectus to NAI, the commercial brokerage community, and CCIM brokers;
- Conduct a cold call campaign with current real estate contacts; and
- Gather and maintain results of marketing.

Beginning after the Effective Date, Mr. Ziehe shall provide monthly marketing updates to the Reorganized Debtor and to the Pineda Grantor Trust II.

In the event that the Property is valued at amounts less than the amount owed to Pineda Grantor Trust II, the Debtor will still market the Property for sale and use sale proceeds to pay first the Allowed Claim of Cameron County and then to the Pineda Grantor Trust II.  To the extent that the Pineda Grantor Trust II's Allowed Claim is not paid in full, the deficiency amount shall be placed in Class 3 with the General Unsecured Creditors.

### 6.02     The Reorganized Debtor's Obligations Under the Plan

On the Effective Date, the Reorganized Debtor will have a Board of Managers consisting of:  (i) Chester Gonzalez; (ii) the Sanchez Family Limited Partnership; and (iii) Bradley Nordyke.  Chester Gonzalez will be the managing member and responsible for the management of the Reorganized Debtor.  Following the Effective Date the Reorganized Debtor may pay its post-Effective Date operating expenses in the ordinary course of its business without notice or orders of this Court.  The Reorganized Debtor shall continue to perform the statutory duties of the Debtor, as applicable, and those conferred by and contemplated under this Plan until this Case is closed.

With respect to the sale of the Property, the Board of Managers of the Reorganized Debtor will be responsible for evaluating purchase offers on the Property. The Board of Managers will notify Pineda Grantor Trust II of any purchase offers on the Property.

The Board of Managers shall act upon any offers on the Property using its best business judgment and consistent with the fiduciary duties imposed on it by law. Additionally, the Board of Managers will be authorized to enter into contracts for the sale of the Property, and to execute all necessary documents for closing on the sale of the Property.

### 6.03        Exemption from Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan or the making or delivery of any deed or other instrument or transfer under, in furtherance of, or in connection with the Plan, including without express or implied limitation, any transfers to or by the Reorganized Debtor shall not be subject to any transfer, sales, stamp or other similar tax.

### 6.04        Claims Objections

Except as otherwise provided in this Plan in connection with Administrative Claims and Claims of Professionals, objections to Claims must be filed with the Court and served in accordance with the Bankruptcy Rules by the later of (i) ninety (90) days following the Confirmation Date or (ii) thirty (30) days following the date such proof of Claim was timely filed; otherwise, such Claims shall be deemed Allowed in accordance with Section 502 of the Bankruptcy Code, unless an extension of such time period is sought by the Reorganized Debtor.

Prior to the expiration of twenty-one (21) days from receipt of an objection, the claimant whose Claim has been objected to must file with the Court and serve upon the objecting party a response to such Claim objection. Failure to file such a response within the twenty-one (21) day time period shall cause the Court to enter a default judgment against the non-responding claimant and thereby grant the relief requested in the claim objection.

### 6.05        Contingent Claims

Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim will be treated as a Disputed Claim for all purposes under the Plan. The holder of a Contingent Claim will be entitled to a distribution under this Plan only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement or contribution held by a Person that may be liable with the Debtor on a Claim of a Creditor is Disallowed as of the Effective Date if: (a) that Creditors Claim is Disallowed; (b) the Claim for reimbursement or contribution is contingent as of the Effective Date; or (e) that Person asserts a right of subrogation to the rights of the Creditor under Section 509 of the Bankruptcy Code.

**6.06**        **Distributions on Allowance or Disallowance of Disputed Claims**

No distributions will be made to any holder of a Claim unless and until the Claim becomes an Allowed Claim.  If a Claim is not an Allowed Claim as of the Effective Date, distributions on account of that Claim will commence only when the Claim becomes an Allowed Claim.  If a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor will make a distribution in accordance with the terms of this Plan applicable to Claims of the Class in which that Claim is placed.

**6.07**        **Undeliverable/Returned Distributions**

Any distribution to be made to a Creditor will be sent to that Creditor at the address set forth on the proof of claim filed for such Creditor, or if no proof of claim is filed, at the address set forth on the Debtor's Schedules.  In the event that a distribution as herein provided is returned as undeliverable, or a distribution is returned on account of there being no payment due to the affected Creditor, the Reorganized Debtor shall hold such distribution for the affected Creditor for a period of sixty (60) days following the Date of that distribution for the benefit of the Creditor.  If the affected Creditor does not make a demand, in writing, for such unclaimed distribution within the sixty-day period, the Creditor shall forfeit all entitlement to the distribution, and the distribution shall revert to the Reorganized Debtor.

All uncashed Distributions shall be handled in accordance with this Article, unless provided otherwise by applicable law.  Checks issued by the Debtor in respect of any Allowed Claim shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  The holder of the Allowed Claim to whom such check originally was issued shall make a request for re-issuance of any check to the Reorganized Debtor.  Any claim in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check; provided however checks issued for the final Distribution that become null and void in accordance with the provisions contained herein shall not be re-issued and the holders of such Claims shall waive any right to the re-issuance of such checks.  After such date, all funds held on account of such voided check shall be remitted to the Reorganized Debtor; the holder of any such Claim shall not be entitled to any other or further Distribution under this Plan on account of such Claim and such Claim shall be deemed disallowed for purposes of any such Distribution.

**6.08**        **Establishment of a Disputed Claims Reserve**

On the occasion of each payment required under the Plan, the Reorganized Debtor, shall deposit Cash in a segregated, interest bearing account in such amount necessary to pay all Disputed Claims in accordance with the terms of this Plan if such Claims were to become Allowed Claims.  This account shall be called the Disputed Claim Reserve.  The Reorganized Debtor shall hold the Disputed Claim Reserve in trust for the benefit of the holders of Allowed Claims whose Distributions are unclaimed and the holders of Disputed Claims pending determination of their entitlement thereto under the terms of the Plan.  When a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor shall release and deliver the Distributions reserved for such Allowed Claims (net of distribution costs) from the Disputed Claim Reserve.

To the extent of any funds exist in the Disputed Claim Reserve after resolution of all Disputed Claims and distribution to all Allowed Claims, such funds shall be released to the Reorganized Debtor.

### 6.09          Additional Charges

Except as may be expressly provided in the Plan or allowed by the Bankruptcy Court, no interest, penalty, attorney's fee or late charge shall be allowed or paid with respect to any Claim.

### 6.10          Treatment of Executory Contracts and Unexpired Leases

a.       <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.  On the Effective Date, the following Executory Contract shall be assumed by the Debtor:  (i) the insurance premium financing agreement with Flat Iron Capital and (ii) the utility services agreement with the Brownsville Public Utilities Board, subject to the terms and conditions negotiated between the Debtor and the Brownsville Public Utilities Board regarding adequate protection.

Other Executory Contracts or unexpired leases that have not been previously assumed or rejected by the Debtor shall be deemed rejected by the Debtor under Sections 365(a) and 1123 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute approval of such rejection of these Executory Contracts or unexpired leases.

b.       <u>Objections to Assumption and Assignments of Executory Contracts and Unexpired Leases</u>.  To the extent that any party to an Executory Contract or unexpired lease identified for assumption:  (i) asserts arrearages or damages pursuant to Section 365(b)(1) of the Bankruptcy Code in an amount different from the amount, if any, set forth in the Debtor's Schedules; (ii has any objection to the proposed adequate assurance of future performance, if required, or (iii) has any other objection to the proposed assumption or cure of a particular Executory Contract or unexpired lease on the terms and conditions provided for herein, all such asserted arrearages or damages, and any other objections shall be filed and served within the same deadline and in the same manner established for filing objections to Confirmation.

Failure to assert arrearages or damages different from the amount set forth in the Schedules, or to file an objection within the time period set forth above, shall constitute consent to the assumption on the terms provided for herein, including acknowledgment that:  (i) the Debtor has provided adequate assurance of future performance, if required; (ii) the amount identified for "cure," if any, is the amount necessary to compensate for any and all outstanding defaults or actual pecuniary loss under the Executory Contract or unexpired lease to be assumed; and (iii) no other defaults exist under such Executory Contract or unexpired lease.  If an objection to assumption and assignment is filed based upon lack of adequate assurance of future performance or otherwise, and the Court determines that the Debtor cannot assume the Executory Contract or unexpired lease either as proposed or as may be proposed pursuant to a modified proposal submitted by the Debtor, then the Executory Contract or unexpired lease shall be deemed to have been rejected.

     c.    <u>Payments Related to Assumption of Executory Contracts and Unexpired Leases</u>.  Any monetary defaults, including claims for actual pecuniary loss, under each Executory Contract and unexpired lease to be assumed under the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount, if any, as otherwise agreed by the parties, or as ordered by the Bankruptcy Court in Cash within ninety (90) days following the Effective Date, or on such other terms as may be agreed to by the parties to such Executory Contract or unexpired lease.  In the event of a dispute regarding: (i) the amount of any cure or pecuniary loss payment; (ii) the ability of Reorganized Debtor to provide adequate assurance of future performance under the contract or lease to be assumed, if required; (iii) any other matter pertaining to assumption, the cure or pecuniary loss payments required by Section 365(b)(1) of the Bankruptcy Code shall be made within a reasonable time following entry of a Final Order resolving the dispute and approving assumption.

     d.    <u>Bar Date for Rejection Damages.</u>  If the rejection of an Executory Contract or unexpired lease pursuant to Article 6 of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim, to the extent that it is timely Filed and is an Allowed Claim, shall be classified in Class 3; provided, however, that the Unsecured Claim arising from rejection shall be forever barred and shall not be enforceable against a Debtor, Reorganized Debtor, their successors or properties, unless a proof of Claim is Filed and served on the Reorganized Debtor within thirty (30) days after the Bankruptcy Court's entry of the Confirmation Order.

## 6.11    Pending Claims and Causes of Action

**THE FOLLOWING DISCUSSION IS NOT INTENDED TO BE EXHAUSTIVE AND SHALL NOT LIMIT OR MODIFY ANY CLAIMS OR CAUSES OF ACTION OF THE ESTATE, INCLUDING AVOIDANCE ACTIONS.   ALL CLAIMS OF THE BANKRUPTCY ESTATE ARE BEING PRESERVED AND TRANSFERRED TO THE REORGANIZED DEBTOR UNDER THE PLAN.  ADDITIONALLY, THE PLAN DOES NOT AND IS NOT INTENDED TO RELEASE ANY CAUSES OF ACTION.**

     Any and all Causes of Action which the Debtor may have, including, but not limited to Avoidance Actions, which may be enforceable under any statute, shall be preserved and shall constitute Property of the Estate to be conveyed to Reorganized Debtor in accordance with the Plan.  After the Effective Date, the Reorganized Debtor, in its sole discretion, shall evaluate the potential Causes of Action including, but not limited to, Avoidance Actions and determine whether to pursue any such Causes of Action for the benefit of the holders of Allowed General Unsecured Claims.  The Reorganized Debtor may prosecute, compromise, or otherwise resolve any and all Causes of Action, including Avoidance Actions, that the Reorganized Debtor determines should be pursued.  The Reorganized Debtor shall retain counsel on an appropriate basis to prosecute any Causes of Action, including Avoidance Actions.  The Bankruptcy Court shall retain jurisdiction to adjudicate any and all Causes of Action including Avoidance Actions and approve any settlement thereof.  The net proceeds of the Causes of Action, including the Avoidance Actions, shall be distributed, first, in payment of the litigation fees and expenses of

the Reorganized Debtor, and, second, for distribution pro rata to the holders of Allowed General Unsecured Claims.

The Debtor may have Causes of Action against certain former managers, directors, and/or officers for their prior acts or omissions, including, but not limited to, breach of fiduciary duty, defalcation, malfeasance, fraud, conversion, embezzlement, and turnover of funds wrongfully paid by the Debtor. Such Causes of Action against certain former managers, directors, and/or officers are expressly reserved and conveyed to the Reorganized Debtor. The Reorganized Debtor shall continue to investigate these potential Causes of Action and determine whether to prosecute these Causes of Action against certain former managers, directors, and/or officers. The Debtor identifies these Causes of Action out of an abundance of caution so that any such claims are preserved. There is no guarantee that the Reorganized Debtor will bring such Causes of Action.

The Debtor's Statement of Financial Affairs identifies the parties who received payments and transfers from the Debtor, which payments and transfers may be avoidable under the Bankruptcy Code. In particular, Section 3 of the Debtor's Statement of Financial Affairs identifies those parties that received transfers from the Debtor during the ninety (90) days preceding the Filing Date, which transfers may be avoidable under Chapter 5 of the Bankruptcy Code. As listed on its Statement of Financial Affairs, the Debtor made the following payments to its creditors within ninety (90) days of its Petition Date:

| Creditor | Amount | Date(s) |
|---|---|---|
| Union Insurance Company | $70,350.00 | |
| Pineda Grantor Trust II | $93,572.00 | June 7, 2013 |
| | $93,572.00 | July 3, 2013 |
| Brownsville Public Utilities Board | $21,180.00 | June 28, 2013 |
| | $27,310.00 | July 16, 2013 |
| | $21,248.00 | August 19, 2013 |
| BHS Enterprises | $51,000.00 | June 7, 2013 |
| Flat Iron Capital | $11,925.00 | July 10, 2013 |
| | $11,925.00 | August 2, 2013 |

The Debtor may have Causes of Action, including Avoidance Actions, against the above-listed creditors. The Reorganized Debtor may prosecute, compromise, or otherwise resolve any and all Causes of Action, including Avoidance Actions, against the above-listed creditors. The Debtor does not anticipate a net recovery from the prosecution of Avoidance Actions.

ADDITIONALLY, YOU MAY BE SUED IF:

1.       You were a manager of the Debtor and you breached a duty of care, or committed fraud, defalcation, malfeasance, conversion, or embezzled funds;

23

2.      You were a professional engaged to represent the Debtor and you breached a duty of care;

3.      You were or are a creditor and you received a payment on a prior debt within ninety (90) days before the Petition Date;

4.      You were an insider of the Debtor and you received a payment on a prior debt within one (1) year before the Petition Date;

5.      You received any payments or property from the Debtor for goods or services you did not deliver or provide before the Petition Date;

6.      You received any payments of property from the Debtor without providing reasonably equivalent value;

7.      You received pre-payments, advances, or deposits from the Debtor which you did not earn;

8.      You were involved in pending litigation with the Debtor at the time of the Petition Date or have been sued thereafter;

9.      You owe the Debtor any money under a contract or as a result of your breach of contract with the Debtor;

10.     Potential claims against you or any of your affiliates are described or referred to in this Disclosure Statement; or

11.     The Debtor has any claims against you under state or federal law, whether in contract or in tort, whether known or unknown

**6.12        Funding the Post-Confirmation Expenses of the Reorganized Debtor**

The Reorganized Debtor shall fund its post-confirmation expenses for 2014 with Cash on hand.  Attached as an exhibit to this Disclosure Statement is a list of Reorganized Debtor's anticipated post-confirmation expenses.  To the extent that there is insufficient Cash to pay for these anticipated post-confirmation expenses, either:  (i) the members of the Debtor shall contribute capita, on a pro rata basis, to make up for any Cash deficiencies or (ii) the Reorganized Debtor will shorten the time period to market the Property such that there will be sufficient Cash to cover the Reorganized Debtor's anticipated post-confirmation expenses for 2014.  The members have not yet voted on whether to fund any Cash deficiencies.  To the extent that the Plan requires the members of the Debtor to fund Cash deficiencies, the availability of such funding will be included in the evidentiary presentation at confirmation of the Plan.

24

## VII.  CONFIRMATION OF THE PLAN

**7.01        Feasibility**

As a condition to confirmation of a plan, Section 1129 of the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.

Because funding of the Plan is centered on the sale of the Property, the Debtor's valuation of the Property provides a reasonable basis to project payments under the Plan.  The Projections provide the revenues and expenses under the Plan, and demonstrate the Plan's feasibility.  Based on the valuation of the Property, the Debtor believes that all creditors will be paid in full upon the closing of the sale of the Property.  Additionally, should the Debtor have to transfer the Property to Pineda Grantor Trust II, the Debtor believes that all creditors will receive the indubitable equivalent of their Claim.

**7.02        Best Interests Test**

In order to confirm the Plan, the Court must find that each holder of an impaired Claim or Equity Interest either (i) accepted the Plan or (ii) received or retained under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. In a typical Chapter 7 case the debtor ceases operations and a Chapter 7 trustee is appointed to conduct an orderly liquidation of the Debtor's assets.  The liquidation proceeds, net of trustee's fees and other costs and expenses incurred in conducting the liquidation, are distributed to Creditors in accordance with their rights and statutorily prescribed priorities of payment under the Bankruptcy Code.

If this Case were converted to a Chapter 7 liquidation, the Court may lift the automatic stay to permit Pineda Grantor Trust II to foreclose its Lien on the Property.  The Debtor believes that it is highly unlikely that Pineda Grantor Trust II would credit bid more than the amount of the Debtor's indebtedness in a foreclosure sale, meaning other creditors and parties-in-interest would likely recover nothing unless a higher cash bidder appeared at the sale.  Thus, a foreclosure by Pineda Grantor Trust II would decrease the funds available to pay other creditors and parties-in-interest, and may eliminate any possible equity in the Property.

Alternatively, the Chapter 7 Trustee may try to market and sell the Property himself. The Debtor believes that a sale of the Property by the Chapter 7 Trustee would reduce the recovery to holders of Allowed General Unsecured Claims because of the additional administrative expenses involved in the appointment of a Chapter 7 Trustee, and the additional administrative expenses involved in the retention of Professionals to assist the Chapter 7 Trustee in marketing and selling the Property.   Once the Property has been sold, and subject to prior orders of the Court, Claims would be paid in the following order:

1.        Allowed Claims of Secured Creditors (Cameron County and Pineda Grantor Trust II);

2.    The Chapter 7 Trustee's expenses, including the fees and expenses of Professionals retained by the Chapter 7 Trustee to assist in the marketing and sale of the Property;

3.    Expenses incurred during the Chapter 11 case and allowed by the Court, including Allowed Administrative Claims from the Chapter 11 period of the case;

4.    A Pro Rata distribution of any remaining funds to the Allowed Claims of General Unsecured Creditors.

Given the foregoing, the Debtor believes that holders of Allowed General Unsecured Claims would receive under a distribution under the Plan that is equal to, if not greater than, what they would receive in a Chapter 7 liquidation.

## VIII.  ALTERNATIVES TO THE PLAN

### 8.01        General

The Debtor believes that the Plan affords the holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) an alternative plan of reorganization; or (b) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code; or (c) dismissal of the Chapter 11 Case.   BASED UPON THE DEBTOR'S ASSESSMENT, UNSECURED CREDITORS WOULD RECEIVE NO DISTRIBUTIONS IN A CHAPTER 7 CASE OR IN THE EVENT OF DISMISSAL OF THE CASE.

### 8.02        Alternative Plans

If the Plan is not confirmed, the Debtor or any other party in interest in the case could attempt to formulate and propose a different plan.  Other parties may propose alternative plans, but the Debtor does not believe that any other plan will provide a greater recovery for the Creditors than proposed by Debtor's Plan, or that any such plans will be feasible.

### 8.03        Liquidation Under Chapter 7 or Dismissal

If this Case were converted to a Chapter 7 liquidation, the Court may lift the automatic stay to permit Pineda Grantor Trust II to foreclose its Lien on the Property.  The Debtor believes that it is highly unlikely that Pineda Grantor Trust II would credit bid more than the amount of the Debtor's indebtedness in a foreclosure sale, meaning other creditors and parties-in-interest would likely recover nothing unless a higher cash bidder appeared at the sale.   Thus, a foreclosure by Pineda Grantor Trust II would decrease the funds available to pay other Creditors and parties-in-interest, and may eliminate any possible equity in the Property.

Alternatively, the Chapter 7 Trustee may try to market and sell the Property himself. The Debtor believes that a sale of the Property by the Chapter 7 Trustee would reduce the recovery to holders of Allowed General Unsecured Claims because of the additional administrative expenses involved in the appointment of a Chapter 7 Trustee, and the additional

26

administrative expenses involved in the retention of Professionals to assist the Chapter 7 Trustee in marketing and selling the Property.   Once the Property has been sold, and subject to prior orders of the Court, Claims would be paid in the following order:

1.       Allowed Claims of Secured Creditors (Cameron County and Pineda Grantor Trust II);

2.       The Chapter 7 Trustee's expenses, including the fees and expenses of Professionals retained by the Chapter 7 Trustee to assist in the marketing and sale of the Property;

3.       Expenses incurred during the Chapter 11 case and allowed by the Court, including Allowed Administrative Claims from the Chapter 11 period of the case;

4.       A Pro Rata distribution of any remaining funds to the Allowed Claims of General Unsecured Creditors.

Given the foregoing, the Debtor believes that holders of Allowed General Unsecured Claims would receive a distribution under the Plan that is equal to, if not greater than, what they would receive in a Chapter 7 liquidation.

## IX.  RISK FACTORS

The Projections are based on numerous assumptions that are an integral part of the Projections.  The assumptions and estimates underlying the Projections are inherently uncertain, and are subject to business risk, economic risk, competitive risk, and other uncertainties that could materially affect the accuracy of the Projections.  Consequently, the Projections contained in this Disclosure Statement are not intended to be, nor should they be received as, representations that the Projections will be achieved.

## X.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The transactions contemplated by the confirmation of the Plan may have an impact on the tax treatment received with respect to distributions under the Plan.  That impact may be adverse to a creditor or interest holder.  The Debtor has attempted to structure the Plan to preserve any valuable tax attributes.

An analysis of federal income tax consequences of the Plan to Creditors, interest holders, and the Debtor requires a review of the Internal Revenue Code, the Treasury regulations promulgated thereunder, judicial authority, and current administrative rulings and practice.  The Plan and its related tax consequences are complex.  Neither the Debtor nor the Debtor's counsel have requested a ruling from the Internal Revenue Service with respect to these matters.   Accordingly, no assurance can be given as to the Internal Revenue Service's interpretation of the Plan.

THE TRANSACTION CONTEMPLATED BY THE CONFIRMATION OF THE PLAN MAY HAVE AN IMPACT ON THE TAX TREATMENT OF ANY CREDITOR OR INTEREST HOLDER.  THAT IMPACT MAY BE ADVERSE TO THE CREDITOR OR INTEREST HOLDER.  NOTHING HEREIN INTENDED TO BE ADVICE OR OPINION

AS TO THE TAX IMPACT OF THE PLAN ON ANY INDIVIDUAL CREDITOR OR INTEREST HOLDER.  EACH CREDITOR OR INTEREST HOLDER IS CAUTIONED TO OBTAIN INDEPENDENT AND COMPETENT TAX ADVICE PRIOR TO VOTING ON THE PLAN.

## XI.  JURISDICTION OF THE COURT

The Bankruptcy Court shall retain and have exclusive jurisdiction over this Case for the purposes stated in items 1 through 13 below.  If the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of or relating to this Case, this section shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

1.  To determine any and all objections and proceedings involving the allowance, estimation, classification and subordination of Claim, including any counterclaim;

2.  To determine any and all applications for allowance of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or this Plan;

3.  To determine any applications pending on the Effective Date for the rejection or assumption of executory contracts or unexpired leases or for the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which one of the Debtor is a party or with respect to which one of the Debtor may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

4.  To determine any and all applications, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date;

5.  To consider any modifications of this Plan, remedy any defect or omission or reconcile any inconsistency in any order of the Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code;

6.  To determine all controversies, suits, disputes and proceedings that may arise in connection with the interpretation, enforcement, consummation or performance of the Plan or any Person's obligations hereunder;

7.  To determine all controversies, suits, disputes and proceedings that may arise in connection with this Plan;

8.  To hear and determine any Claim belonging to the Debtor, and to consider and act on the compromise and settlement of any other Claim against, or cause of action asserted by, the Debtor;

9.      To recover all assets of the Debtor and property of the Debtor's Estate, wherever located;

10.     To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under Section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Petition Date through, and including, the date that any final distribution is made);

11.     To enter a Final Decree closing the Case;

12.     To issue orders in aid of execution of this Plan to the extent authorized by Section 1142 of the Bankruptcy Code; and

13.     To determine such other matters as may be set forth in the Confirmation Order or which may arise in connection with this Plan or the Confirmation Order.

## ARTICLE XII

**MISCELLANEOUS**

### 12.01        Amendment or Modification of the Plan

The Debtor's Plan may be amended or modified by the Debtor prior to the Confirmation Hearing pursuant to Section 1127(a) of the Bankruptcy Code, and, to the extent applicable, Bankruptcy Rule 3019. Post-confirmation amendments or modifications of the Plan may be allowed by the Court under Section 1127(b) of the Bankruptcy Code if the proposed amendment or modification is offered before the Plan has been substantially consummated. The sole right to amend or modify the Plan at any time shall be reserved to the Debtor and the Reorganized Debtor.

### 12.02        Effective Date

The Effective Date will be the first Business Day that is thirty (30) days after the Confirmation Date in which: (i) no stay of the Confirmation Order is in effect and (ii) all conditions to effectiveness set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. No payments to creditors will be made prior to the Effective Date.

AUS-5948111-1 6061534/1

# ARTICLE XIII

**MATERIAL DEFAULT PROVISIONS AND THE EQUITY TRUST**

### 13.01        Material Default Provisions

A failure to timely make a payment to a holder of an Allowed Claim pursuant to the terms of the Plan shall be an "Event of Default."  Following an Event of Default, each holder of an Allowed Claim shall have the right to enforce their rights under the Plan by sending a written "Notice of Default" to the Reorganized Debtor and the Trustee of the Brownsville MD Ventures Equity Trust at the following addresses:

<u>To the Reorganized Debtor:</u>

Brownsville MD Ventures, LLC
c/o Chester Gonzalez
4750 North Expressway
Brownsville, Texas 78520

with a copy to:

Kell C. Mercer
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, Texas  78701
(512) 472-5456
(512) 479-1101

<u>To the Trustee of the Brownsville MD Ventures Equity Trust:</u>

Richard Robbins
647 Drifting Wind Run
Dripping Springs, Texas 78620

With respect to each holder of an Allowed Claim in Classes 1 or 2, and subject to the applicable provisions of the Plan, if the Event of Default is not cured within ten (10) business days after service of a written Notice of Default then a "Class 1 or 2 Material Default" shall have occurred and the holder of an Allowed Claim in Classes 1 or 2 having provided such Notice of Default may:  (i) enforce the entire amount of its claim and (ii) seek such relief as may be appropriate in any court of competent jurisdiction.

### 13.02        Establishment of the Brownsville MD Ventures Equity Trust.

On or after the Confirmation Date, but prior to the Effective Date, the Debtor's members shall execute the Brownsville MD Ventures Equity Trust Agreement and shall take all other steps necessary to establish the Brownsville MD Ventures Equity Trust.  Richard Robbins will

30

serve as the Trustee of the Brownsville MD Ventures Equity Trust.  Copies of Richard Robbins' curriculum vitae and the proposed Trust Agreement, which details the Trust and the Trustee's duties and powers, are attached as exhibits to this Disclosure Statement.  Mr. Robbins will be compensated on an hourly basis, with the rate being $200 per hour.  On such date of execution, or as soon as practicable thereafter, including, without limitation, subject to appropriate or required governmental, agency, or other consents, the Debtor's members shall issue to the Brownsville MD Ventures Equity Trust their membership interests in the Debtor.

The Brownsville MD Ventures Equity Trust shall be established for the sole purpose of holding the membership interests of the Debtor in accordance with applicable Treasury Regulations and the terms and provisions of the Brownsville MD Ventures Equity Trust Agreement.  If the Property is not sold by the Outside Date, the Equity Interests shall be extinguished and the Brownsville MD Ventures Equity Trust shall terminate.  If the Property is sold before the Outside Date, the proceeds shall be distributed first to pay the Allowed Claim of Cameron County, then the Allowed Claim of Pineda Grantor Trust II, then to the holders of Allowed General Unsecured Claims, with any surplus to be distributed to the Trustee of the Brownsville MD Ventures Equity Trust for distribution per its terms to the Members.  Upon such distribution, the Equity Interests shall terminate and the Brownsville MD Ventures Equity Trust shall terminate.

Without limiting the foregoing, the Brownsville MD Ventures Trust Agreement shall provide that, to the extent of a default under the Plan, the Equity Interests shall be extinguished and the Brownsville MD Ventures Equity Trust shall wind-up and terminate.

In accordance with the Brownsville MD Ventures Equity Trust Agreement and any agreements entered into in connection therewith, on the Effective Date, the Reorganized Debtor shall fund the reasonably anticipated expenses of the Brownsville MD Ventures Equity Trust with current Cash on hand.  If necessary, the Reorganized Debtor shall continue to fund, with Cash on hand additional reasonable expenses of the Brownsville MD Ventures Equity Trust until it has been terminated.  To the extent that the Reorganized Debtor does not have sufficient funds, then the members of the Debtor will make sufficient capital contributions, on a pro rata basis, to the Reorganized Debtor to fund these payments.

No Distributions on account of the membership interests of the Debtor held by the Trustee shall be made during the Plan Period.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Trustee), the Trustee shall file returns for the Brownsville MD Ventures Equity Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Trustee shall also annually send to each holder of a Brownsville MD Ventures Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit, and the Trustee shall instruct all such holders to report such items on their federal income tax returns.  The Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Brownsville MD Ventures Equity Trust that are required by any governmental unit.

The Brownsville MD Ventures Equity Trust shall terminate no later than the sixth (6th) anniversary of the Effective Date; provided, however, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Brownsville MD Ventures Equity Trust if necessary. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years from and after the sixth (6th) anniversary of the Effective Date.

## XIV.  CONCLUSION AND RECOMMENDATION

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED ABOVE AND THAT THE PLAN IS DESIGNED TO PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN ANY OTHER FORM OF LIQUIDATION.  ANY OTHER ALTERNATIVE WOULD CAUSE SIGNIFICANT DELAY AND UNCERTAINTY, AS WELL AS ADDITIONAL ADMINISTRATIVE COSTS.  THUS, THE DEBTOR RECOMMENDS CONFIRMATION OF THE PLAN.**

Date:  February 27, 2014                    BROWNSVILLE MD VENTURES, LLC


                                            By:  */s/ Chester Gonzalez*_____
                                                 Chester Gonzalez
                                            Title:  Chairman of the Board of Members


COUNSEL FOR BROWNSVILLE MD VENTURES, LLC

Kell C. Mercer
State Bar No. 24007668
kell.mercer@huschblackwell.com
Sam Chang
sam.chang@huschblackwell.com
State Bar No. 24078333
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 479-9758
(512) 226-7318 (fax)

AUS-5948111-1 6061534/1