IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BROWNSVILLE MD VENTURES, LLC | § | CASE NO. 13-10341 |
| | § | CHAPTER 11 |
| DEBTOR. | § | |

**OBJECTION OF PINEDA GRANTOR TRUST II TO THE FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF BROWNSVILLE MD VENTURES, LLC**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Pineda Grantor Trust II ("Pineda") a secured creditor of the Debtor who files this objection to the First Amended Chapter 11 Plan of Reorganization of Brownsville MD Ventures, LLC ("Debtor"), and for cause would show the Court as follows:

## I.
## INTRODUCTION

1.　Pineda is a secured creditor of the Debtor and asserts a lien on the real property and improvements thereon owned by the Debtor and in the cash held by the Debtor. Pineda has filed a proof of claim in this proceeding on January 16, 2014, in the amount of $13,661,845.29. Since the filing of the bankruptcy, Pineda and the Debtor have entered into a series of cash collateral orders that preserves Pineda's lien to the cash held by the Debtor throughout the bankruptcy proceeding.

2.　The property owned by the Debtor is vacant and is not generating any revenues. The Debtor has lost its license with the state of Texas to operate a hospital at the location. The Debtor has no employees and has been unwilling or incapable of paying any ad valorem taxes owed on the property since 2012. The Debtor is delinquent for the 2012-2013 tax year in the

1

amount of approximately $713,000.00. Interest continues to accrue on the ad valorem taxes in accordance with the statutory rate. Additionally, the Debtor is not making escrow payments for taxes that will be due in 2014.

3. The Debtor has marketed the property since 2012, but has been unable to sell the property. Since the property has become vacant in 2012, potential offers made to the Debtor have steadily declined so that if accepted by the Debtor a substantial deficiency would exist on the debt owed to Pineda. Additionally, the property has been the subject of litigation as the Debtor has previously sued the general contractor and other subcontractors that worked on the building. The Debtor claimed through that litigation that the property is infested with mold and is riddled with numerous construction defects. The Debtor claimed in that litigation that the property damages associated with the construction defects range in the amount between $9 million to $13 million. The Debtor received from the litigation an amount in excess of $6 million. However, the property has yet to be remediated.

## II.
## SUMMARY OF THE PLAN

4. The Debtors Plan provides that the Debtor will attempt to market and sell the property so long as Pineda's cash collateral will allow it to pay various expenses associated with the building. When the Debtor runs out of cash, the Debtor plans to transfer to Pineda the property in satisfaction of Pineda's debt. The Debtor contends there is substantial equity in the property thereby insuring that Pineda's interest in its collateral is adequately protected and the Plan is feasible. The Debtor's Plan does not specifically obligate the Debtor's equity owners to contribute capital to the Debtor. The Debtor's Plan contemplates the future accrual of property taxes on the building. Additionally, the Debtor has not and does not contemplate any repairs on the building including the repair of water leaks.

## III.
## OBJECTIONS TO THE PLAN

A.   The Plan is not Proposed in Good Faith.

5.   Pursuant to §1129(a)(3), the Debtor must propose its Plan in good faith. Good faith based in the context of Chapter 11 Plan is viewed from the totality of the circumstances surrounding the Plan. *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. Partnership,* 116 F.3d 790, 802 (5th Cir. 1997). In this instance, the Debtor plans to market the property for so long as Debtor can use Pineda's cash collateral. After the Debtor runs out of cash and if the property is not sold, Pineda will receive the property with additional taxes owed and its cash collateral depleted. During this time, the property continues to depreciate as the windows are leaking and general maintenance is not being made. In short, the Debtor's Plan places the entire risk of its reorganization squarely on the shoulders of Pineda together with all the attendant risk that the Debtor will not sell the property during the term of the Plan. As such, the Plan is not proposed in good faith.

B.   Feasibility.

6.   The Debtor's Plan also is not feasible pursuant to §1129(a)(11) of the Code. First, the Plan provides a very limited period of time to sell the property. The Debtor has marketed the property for over two (2) years and has yet to enter into a viable contract to sell the property. Depending on the various assumptions of cash outflows that the Debtor will have to make in order to confirm a Plan, the Debtor may have as little as a month to market and sell the property to perhaps six (6) months. The possibility of the Debtor of selling the property within this time period for an amount equal to or in excess of Pineda's secured claim is too speculative to be confirmable. The Debtor's highly speculative and optimistic assumptions must be tempered with the reality of the market. *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 508 (S.D.N.Y.

1994). In short, the Debtor's Plan to sell the property within the relatively short window of less than six (6) months is unrealistic and speculative to be confirmed.

7. Second, the Plan also cannot be confirmed due to feasibility on another basis. The Debtor projects that sufficient money will be generated from the sale of the property to pay all creditors. However, the property value is sufficiently below the amount of Pineda's debt such that there is no equity for the benefit of unsecured creditors in the case. The Debtor's lack of equity in the building is further compelled by the fact that the Debtor is proposing a negative amortization of Pineda's secured claim. While the Debtor claims it is offering to pay interest between 4% to 6% per annum on Pineda's claim, the Debtor will only pay this amount if and when the Debtor sells the property. If the Debtor does not sell the property before it runs out of cash to pay utilities and insurance, the debt will then balloon and Pineda will receive the property in satisfaction of its debt. In essence, when the Plan's marketing period expires, the Debtor will be liquidated.

8. The Court is further instructed in reviewing the feasibility of the Debtor's Plan the following factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the Plan. *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989). In this case, the Debtor is poorly capitalized, has no earning power, and management of the Debtor is in a state of conflict. The Debtor merely hopes that it will sell the property over a very short period of time, but cannot provide any evidence of a likely sale to any party. Thus, the Debtor's Plan fails to provide any evidence that it can perform under the terms of its Plan and the Plan cannot be confirmed

because it is not feasible.  *Id.*  (failure of Debtor to provide any evidence as to the likelihood of a willing buyer or lender who would lend 100% of the value of the building before the terms of the Plan expired means that the Plan is not feasible.)  The Debtor's proposed Plan merely allows it to postpone the inevitable, and to gamble, with Pineda's money on the long shot hopes that it can sell the property for more than Pineda's claim and is therefore insufficient to be confirmed.  *M&S Associates, Ltd.,* 138 B.R. 845, 852 (Bankr. W.D. Tex. 1992).

9. As the property must be sold by the earlier of December 31, 2014, or when the Debtor depletes the cash on hand, the value contemplated by the Debtor will not materialize from the Plan.  The unsecured creditors will not receive any distribution of monies through the sale.  Further, the Debtor has provided no evidence that it holds litigation claims that will fund the payment of claims against the estate.  To the extent that the Debtor contemplates cash contributions from the owners, the Debtor has provided no evidence of the owners' willingness to be so committed, the amount of the cash commitment, or the owners' ability to pay the commitment.  For these additional reasons, the Debtor's Plan is not feasible.

C. Factors under 1129(b)

10. The Debtor seeks to confirm the Plan over the objection of Pineda.  Pineda has voted against the Plan.  Thus, the factors enumerated under §1129(b) of the Code comes into play.  In particular the Plan must be fair and equitable to Pineda in order for the Plan to be confirmed over Pineda's objections.

11. Pineda holds a lien on the cash held by the Debtor and in the real property owned by the Debtor.  First, with respect to Pineda's cash collateral, the Debtor's Plan contemplates the use of the cash without any corresponding payment to Pineda of the cash being used.  The Debtor proposes to pay post-confirmation expenses of the Debtor including taxes, insurance, and

administrative expenses with the cash. The Debtor generates no income to replace the cash that it continues to burn while the property is being sold. With respect to Pineda's cash collateral, the Debtor's Plan violates §1129(b) as the Debtor fails to either surrender the cash to Pineda, allow Pineda to retain its lien in cash collateral, or the Plan fails to provide to Pineda the realization of the indubitable equivalent of Pineda's lien in the cash. As the building holds no equity for the benefit of the estate, any Plan that fails to return to Pineda's collateral violates §1129(b).

12.   With respect to Pineda's lien on the building, the Plan fails to meet the requirements of §1129(b). While Pineda's lien on the property is preserved thus the Plan, the Debtor fails to provide deferred cash payments with a present value at least equal to the amount of Pineda's claim. In this regard, the proposed rate provided in the Plan does not adequately account for the risk inherent in the Plan that the Debtor will sell the property for an amount that will pay Pineda in full. This risk is further compounded as the Debtor defers payment of the 2014 ad valorem taxes and interest until the Debtor sells the property. The Debtor's election to defer payment of taxes subordinates Pineda's lien on the property and lessens the value to Pineda of its lien rights. The Debtor presently owes over $700,000 in back taxes on the property. The Debtor's tax liability will increase because of the lack of payments that will occur in 2014. If Pineda was able to immediately foreclose on the property, it could avoid incurring the substantial penalties and interest that will be accrued when the Debtor fails to sell the property and then transfers the property to Pineda.

    D.   <u>Other Consideration for the Court.</u>

13.   The Debtor's Plan is a dirt for debt plan that is intended to transfer the property to Pineda as payment for the debt. The Debtor's strategy in this regard is to eliminate any deficiency claim against the guarantors of the Pineda claim. In keeping with the provisions of

§1129(b) and other provisions of the Code, any valuation of the building must be made on a conservative basis. *In re Simmons*, 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990). (in the context of a dirt for debt plan, the court must value the property conservatively as the Debtor has shifted the risk of loss to the secured creditor.) *See* also *In re Centennial Park LLC,* 2011 WL 5520968 *2 (Bkrtcy D. Kar. 2011). The Debtor's expert has assumed an aggressive valuation of the property. For example, previously the Debtor claimed in other litigation, the property was damaged in the range between $9 to $13 million. However, for purposes of this case, the Debtor's expert disregards the Debtor's prior admissions and experts and adopts the position of the adverse parties' expert in the prior litigation as it concerns damages to the building in the amount of $2.5 million. The Debtor is judicially or equitably estopped or has conclusively admitted that the damages to the building is not less than $9 million. Based on applicable case law, the Court is instructed to value the property conservatively and that assumes the more reasonable scenario of holding time and repairs.

14. Finally, for the reasons set forth in Paragraph 5 of this objection related to the Debtor's lack of good faith, the Debtor's Plan is not fair and equitable to Pineda. The Plan shifts virtually all of the risk of plan failure upon Pineda. The Debtor is allowed to use Pineda's cash and market the collateral and in the event the property is not sold, Pineda has all the risk to repair and then sell the property. The Debtor is also allowed to defer payment of all interest on the debt and does not escrow or set aside cash to pay the current ad valorem taxes that will accrue on the property while it markets the property. *See In Oaks Partners, Ltd*., 141 B.R. 453 (Bankr. N.D. Ga. 1992). (Courts often determine, after analyzing the particular facts of the case, that the negative amortization of secured creditor's claim is not fair and equitable under the circumstances.) The Plan essentially allows the equity owners the ability to obtain what they

perceive to be equity in the property without any downside risk to them in the event they are wrong about value. Simply put, the Plan is not fair and equitable to Pineda.

## CONCLUSION

Pineda's objection to the Plan should be sustained as the Plan violates the Bankruptcy Code and cannot be confirmed over the objection of Pineda. The Debtor's Plan was not proposed in good faith, is not feasible and does not meet the requirements of §1129(b) of the Code. The Court should grant Pineda's Motion to Lift Stay and allow it to exercise its rights to foreclose on the hospital and on its cash.

Respectfully submitted:

SCHAUER & SIMANK, P.C.
615 North Upper Broadway, Suite 700
Corpus Christi, Texas  78401-0781
Telephone:  361-884-2800
Facsimile:   361-884-2822


By: */s/ Ronald A. Simank*
     Ronald A. Simank
     State Bar No. 18359400
     Federal Admission No. 0359

**ATTORNEYS FOR PINEDA GRANTOR TRUST II**

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 28th day of March, 2014, a true and correct copy of the foregoing instrument was sent via electronic mail to all counsel and parties listed on the Court's ECF filing system and deposited in the United States mail, first class postage prepaid to the following:

Brownsville MD Ventures, Inc.
c/o Chester R. Gonzalez
117 East Price Road
Brownsville, TX  78521

Kell Corrigan Mercer
Husch Blackwell LLP
111 Congress Ave., Suite 1400
Austin, TX  78701

U.S. Trustee
Barbara C. Jue
606 N. Carancahua, Suite 1107
Corpus Christi, TX  78401

Shelby A. Jordan
Jordan, Hyden, Womble
Culbreth & Holzer, PC
500 North Shoreline, Suite 900N
Corpus Christi, TX  78401

Vicki M. Skaggs
Atlas & Hall
818 Pecan
P.O. Box 3725
McAllen, TX  78502-3725

William C. Romo
Chapter 7 Trustee
400 N. McColl, Suite E
McAllen, TX  78501

Richard S. Hoffman
5337 Padre Island Hwy.
Brownsville, TX  78521

Cary M. Toland 855 E. Harrison
855 E. Harrison
Brownsville, TX  78520

Gilbert L. Hamberg
1038 Darby Drive
Yardley, PA  19067

Diane Wade Sanders
Linebarger Goggan Blair &
Sampson, LLP
2700 Via Fortuna, Suite 400
Austin, TX  78746

Mark Alan Twenhafel
Walker & Twenhafel, LLP
2424 North 10th Street
Suite 200
McAllen, TX  78502-3766

                                  */s/ Ronald A. Simank*
                                  Ronald A. Simank