IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| In re: | § | Case No.  13-10341 |
| | § | |
| **BROWNSVILLE MD VENTURES,** | § | |
| **LLC.** | § | |
| | § | |
| **Debtor.** | § | **Chapter  11** |

**RESPONSE AND OBJECTION TO THE PINEDA GRANTOR TRUST II's REFUSAL
TO PRODUCE ITS DUE DILIGENCE DOCUMENTS AND TO ITS REFUSAL TO
ESTABLISH ITS CLAIM OF THE IMPROPER TRANSFER OF "RISK"
TO THE TRUST**

TO THE HONORABLE RICHARD SCHMIDT, UNITED STATES BANKRUPTCYJUDGE:

NOW COMES C. Lynn Anderson, MD, and Vicki Miles Rodriguez, parties in interest

and file this Response and Objection refusal by Pineda Grantor Trust II (the "Trust" or

"Movant") To Produce Its Due Diligence Documents, and Its Refusal to Establish Its Claim of

The Transfer of Risk In This Proceeding, as follows:

**I.
PRELIMINARY STATEMENT**

**A.    This Court's Incomplete Record Is Caused By the Pineda Trust Refusal to
Comply with this Court's Order**

1.      Pineda Trust, a Boston Massachusetts Vulture Fund having acquired the

Debtor's secured note and liens for pennies on the dollar, has actively sought to not only impede,

but also prevent, the realization of the value of the Debtor's interest in the Brownsville Doctors

Hospital (the "Hospital").    In that regard, and even though, upon information and belief, the

Trust is made up an affiliated group of investors, the Trust has not filed any disclosures pursuant

to Rule 2019, Bankr.R.Proc. ("BRP"). [1]

---

[1]      The rule requires "every entity...representing more than one creditor" in a Chapter 11 bankruptcy to file a
verified statement of certain information about the claims that the entity represents. This rule applies to attorneys. *In*

2.     Rule 2019, BRP was amended effective December 1, 2011 to address in part certain perceived abuses by hedge funds and vulture funds acquiring debt to control bankruptcy proceedings or using the debt for that purpose.  Although Rule 2019 does not require disclosure of the price and date of the acquisition of the Vulture Funds interest, the rules committee noted:

> Although the rule no longer requires the disclosure of the precise date of acquisition or the amount paid for disclosable economic interest, *nothing in this rule precludes either the discovery of that information or its disclosure when ordered by the court pursuant to authority outside this rule*.  [Emphasis added.]

Fed.R.Bankr.P. 2019 advisory committee's note.   Bankruptcy disclosures are generally intended to level the playing field in the bankruptcy and restructuring process[2] and to that end this Court ordered the production of important documents that the Trust simply refuses to produce.

3.     Following a contested hearing on the Pineda Trust lift stay motion, this Court ordered the Trust to produce its complete due diligence file, including all information that related to the Trust's position on value of the Hospital.  The Court ordered production but gave the Trust the right to respond with any position that would allow non-disclosure.

4.     Valuation drives this Court's determination regarding confirmation of the Plan. In this case the appraisal values are so disparate as to warrant this Court's inquiry into the

---

*re Oklahoma P.A.C. First Ltd. Partnership*, 122 B.R. 387, 389 (Bankr. D. Ariz. 1990).  The purpose of Rule 2019(a) is to help ferret out conflicts of interest. Id. at 392.   *i.e.*, voting:  In re Southland Corp., 124 B.R. 211 (Bankr. N.D. Tex. 1991) [If votes by agent brokers or representatives are to be filed accepting or rejecting Chapter 11 plan under 11 USCA § 1126, there must be disclosure of name and true holder of claim or interest and certification of authority to vote as representative; where entity represents more than one creditor or interest owner, there must be compliance with Bankruptcy Rule 2019 with list of claimants or owners on behalf of whom votes are being cast]; Matter of CF Holding Corp., 145 B.R. 124, (Bankr. D. Conn. 1992) [Disclosure underpinnings of Bankruptcy Rule 2019 require law firms representing multiple entities, i.e., creditors and equity interest holders, to disclose written basis, if any, for their representation of listed entities[;  In re Ionosphere Clubs, Inc., 101 B.R. 844,  (Bankr. S.D. N.Y. 1989)[To be authorized agent of multiple grouping, Bankruptcy Rule 2019 requires that every person purporting to represent more than one creditor in Chapter 11 reorganization file verified statement setting forth names and addresses of creditors, nature and amount of claims, and relevant facts and circumstances surrounding employment of agent; only when agent has express authorization may he file claim on behalf of another].

[2]     D. Scharf, Show and Tell:  Ad Hoc Committee' Rule 2019 Disclosures Under Examination. Am Banrk Inst J. Mar 2009, at 58-59.

particular motives of these sponsored values that disclosure of the Trust's due diligence is of critical importance.

### B. This Court's Inability to Evaluate The "Risk Shifting" Argument and Representations Made On Behalf of the Pineda Trust Without the Due Diligence Documents

5.      Another important basis exists for the production of these documents.   At the conclusion of the Confirmation hearing, the Trust argued that this Court must undertake a review of the valuation testimony as a "conservative" analysis to favor the Trust or, according to the Trust, the Court would be, in effect, "shifting the risk" to the Trust that the valuation found as fair market value could be too high.   This argument raises two critical issues, both addressed by this Brief and Arguments:

a.      Neither this Court, and certainly not this Debtor, can evaluate what the "risk" actually is involved as referenced by the Trust's argument of shifting such risk, until the due diligence documents are produced, and until the "Risk" has a foundation in fact.   If what the Trust is arguing is that it faces a "risk" of loss to its windfall profit it plans to recover by its acquisition of the debt from Compass bank for pennies on the dollar, then that "risk" evidence must be known by this Court and the Debtor.

b.      This Court is likewise urged by the Trust to consider the valuation testimony only conservatively so as to not "shift the risk" to the Trust that the valuation could be determined too high.  The Trust argues that this Court should not make its best determination of fair market value, but should discount its required finding of fair market value determination, so as to protect the Trust.

Neither of these arguments a founded in law or supported by the facts of this case.  In addition to not knowing the truth of the true risk that faces the Trust (its investment is unknown and in fact,

the only "risk" is to its potential windfall profit from its acquisition) the law does not provide or recognize a duty of this Court to favor the Trust over the Debtor, or weigh appraisals by making mental or actual deductions from the determined fair market value to insure all risk is in favor of the vulture fund and not creditors.   The Pineda Trust should be ordered (i) to produce to the Debtor its due diligence documents as well as  (ii) produce the purchase price paid for its secured claim, to allow a fair opportunity for the Debtor to respond and defend against the Trusts argument of its risk and of this Court's risk shifting.   No public policy of bankruptcy supports or justifies a Court's protection of a windfall profit, which is exactly what the Trust seeks in this case.

## II.
## ARGUMENTS AND AUTHORITIES

A.    **Indubitable Equivalence Is The Confirmation Standard – Not a Conservative Version of Indubitable Equivalence**

6.     Court attempts to define the means, and the limits and limitations on what may be proposed to accomplish the "indubitable equivalent" treatment in exchange for discharge of the full amount of an allowed secured claim generally fall into four categories of approved plans. The primary examples approved by Courts, including the Fifth Circuit, include:

- the substitution of collateral as payment in full of the allowed secured claim; or

- the surrender of all collateral as payment in full of the allowed claim;  or

- the surrender of only a part of the collateral as payment in full of an allowed secured claim;  or

- a combination of one or more the above examples.

This Debtor's Plan is a combination of the above.  Support for indubitable equivalence plans of

these types date back to Professor Klee's seminal article explaining the new Bankruptcy Code enacted in 1978 noting the support in the legislative history:  "[a]bandonment of the collateral to the class would satisfy [the indubitable equivalence test], as would a replacement lien on similar collateral.[3]

### i.    The Method -- (Fair Market Valuation is Mandated)

7.    The underlying, and most significant aspect, of reaching a favorable ruling of "indubitable equivalence" necessarily defaults to a "valuation" of each property component.  As one court noted:

> We must agree that if the land being conveyed under the plan to [the oversecured creditor] is worth the amount of its claim, that the indubitable equivalent test is met and that the other objections raised would lack merit. The problem arises in determining whether the land offered is worth the amount of the claim. This is really more a practical problem than a theoretical problem. *And the cause of the problem is the debate inherent in establishing a value for real estate.*

*In re Walat Farms, Inc.*, 70 B.R. 330, 333 (Bankr. E.D. Mich. 1987) (footnote omitted). [Emphasis added.]  Bankruptcy Courts cannot accomplish the goals of reorganization if required to do valuations from a premise that their own valuation determination must never turn out to have been less (or more) than the value ultimately realized.  In *In re Pacific Lumber Co*., 584 F.3d 229, 248-249 (5th Cir. 2009) the Fifth Circuit recently reaffirmed that

> What we have said before remains true: 'Although we recognize that valuation is not an exact science, it remains an integral part of the bankruptcy process.' *citing Matter of Sandy Ridge,* 881 F.2d at 1354.

This reality stems from the need for appraisals arising from two important conditions:

•    The heterogeneous nature of property as an investment class:  no two properties are identical, and all properties differ from each other in their location - which is one

---

[3]    Kenneth N. Klee, "All You Ever Wanted to Know About Cram Down under the Bankruptcy Code," 53 AM. BANKR. L.J. 133, 156 (1979) (*quoted with approval in Pacific Lumber* at *9-10.)

of the most important determinants of their value.

          •      However, of equal importance is the absence of a market-based pricing mechanism similar to the auto industries "blue book" or the stock market or commodity exchanges. These two factors determine the need for an expert appraisal and valuation of real property. These two-market factors likewise accounts for the distinction between "market value" and "market price."[4] Market price is "the price at which one can transact" while market value is "the true underlying value" according to theoretical standards.[5]

8.     Finally, fair market value is an analysis that does not depend on the parties involved. As discussed in detail *infra*, any secured party's argument that

> "much like beauty is in the eye of the beholder, so value (of collateral) is in the hands of the holder. Presumably value could therefore differ depending solely upon whose hands are holding the collateral. Presumably value could therefore differ depending solely upon whose hands are holding the collateral.'
> . . .
> "What about if the secured creditor was a widow, a real estate developer, a guardianship estate for a minor child, a doctor, a church, a blind man, a government agency, etc.? The list is endless.

*In re Peerman* 718, 722 (Bankr. W.D. Tex. 1989).

9.     These considerations require that most hearings involve competing appraisers, and the appropriate valuation methodology will depend upon the fair market value (often considering calculations of the "discounted cash flow analysis" which estimates income and

---

[4]      Bankruptcy courts have held that when the secured collateral has been sold, or there is a sale involved, courts should use the actual sale price, and not some hypothetical evaluation, to determine the value of collateral for the purpose of plan confirmation and sale. *Ford Motor Credit Co.* v. *Dobbins,* 35 F.3d 860, 870 (4th Cir. *1994); Takisaki* v. *Alpine 'Group, Inc. (In re Alpine Group, Inc.),* 151 B.R. 931, 935 (9th Cir. BAP 1993); *Romley* v. *Sun Nat'! Bank (In re Two US" Corp.),* 875 F.2d 240,244 (9th Cir. 1993). In this context, the sale price has been described as "conclusive evidence of the property's value." *In re Alpine Group, Inc.* at 935. The problem in collateral surrender plans is that there is no fair market value sale available and often there is no financing even if an offer would be made with financing.

[5]     *The "market value" concept is most commonly invoked in inefficient markets or disequilibrium situations where prevailing market prices are not reflective of true underlying market value.* Market price becomes to equal market value when the market is informationally efficient and rational expectations prevail.

expenses, or the "discount rate" to come to a current value of the value to be realized in the future) [*i.e.*, the lot sales]).  It is a typical holding period for value to be realized that coverts all anticipated benefits (including income and sale proceeds) to present value utilizing an appropriate rate of return.   In *Chemical Bank v. American Kitchen Foods, Inc. (In re American Kitchen Foods, Inc.)*, 9 C.B.C. 537, 548 (Bankr. D. Me. 1976) the bankruptcy court observed that when discussing the different appraisal results noted the incompatible interests of the debtor and creditor reflected in appraisals: "It is a rare Chapter XI proceeding in which the rub does not come over exactly such valuation issues.").  It is the bankruptcy court that deals with this tug of interests.

10.     In the Fifth Circuit's repeated acknowledging that valuation is an "integral part of the bankruptcy process" it is clear that valuation is not an un-favored alternative to some other methods of dealing with collateral disposition.[6]  In fact, even if a sale is proposed, the Bankruptcy Court must still determine if the sales price and terms are in the best interest of the estate – in other words, is the sale a fair equivalent of the property's fair market value.  Even in an auction context, the court still must determine and approve the final results – sometimes the highest bid is not the winner.   Valuation is unavoidable in the treatment of secured claims and confirmation of plans.  Valuation protects "all of the parties" to a bankruptcy case.  In fact, "[h]ow much money is available for other creditors depends on the disposition of . . . (valuation) proceeding, which is an integral part of (the debtor's) bankruptcy."  *Great American Group, Inc*. 559 F.3d 644 (7th Cir. 2009).

11.     The process of appraisals and determination of "fair market value" has several hundred years of jurisprudence.  Echoing the rule set out in *Pacific Lumber*, the court in *Boyle v.*

---

[6]     It is clear that "market testing" by auctions, sales, even lifting exclusivity have all been discussed as methods, or preferred methods, to determine the fair market value in lieu of appraisals, however, these methods often have no application to the economic "bad times" made the presumption of collateral surrender plans.

*Wells ( In re Gustav Schaefer Co.),* 103 F.2d 237, 242 (6th Cir.), *cert. denied,* 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939) noted that "[t]he valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals *does not establish a mistake in either.*"    "The valuation process is not an exact science and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of ... [the appraisal] evidence." *In re Smith,* 267 B.R. 568, 572-73 (Bankr. S.D. Ohio, 2001).   *See, also, In re Coates,* 180 B.R. 110, 112 (Bankr.D.S.C.1995). Stating the obvious, it is the bankruptcy court that controls the entire process because the valuation process often involves the analysis of conflicting appraisal testimony, the court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses.   It is the bankruptcy judge that prevents "aggressive undervaluing" or "aggressive over-valuing" property as a strategy.[7]  The court's value drives the strategic options in the bankruptcy Code – not the other way around.

12.     Importantly, a Bankruptcy Court does not guarantee that a secured creditor must always have an "out" because of a perceived risk that appraisal valuation may be wrong some day in the future.[8]   *Pacific Lumber* recognized the no-guarantee status of a valued secured claims:

---

[7]       "Aggressive undervaluation" is an enemy of the bankruptcy system.  Referencing "sharp or unauthorized practices" such as "propos(ing) a plan that aggressively undervalues the collateral . . ." the Fifth Circuit's opinion in *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.), 584 F.3d 229 (5th Cir. 2009)* makes special note of the bankruptcy Court's critical importance in making the studied fair market valuation decision.  Texas State law instructs the court on the valuation law applicable to the ability of a mortgagee to assert a deficiency unsecured claim against all potentially liable parties.  A DIP could not be deemed to have less rights than a state law debtor in protecting the estate created by Title 11 from a "aggressively over-valued" deficiency claim caused by an "aggressively undervaluation" focusing on the results of a Texas non-judicial foreclosure acknowledged by the Supreme Court to not be fair market value.

[8]       *Sandy Ridge I,* 881 F.2d at 1354 specifically rejected a creditor's argument that the bankruptcy court cannot set the value of property but must allow the foreclosure sale market to determine its price. "Although valuation hearings can be tedious, the valuation of assets is often necessary to define and protect the rights of the parties and is "an integral part of the confirmation process under Chapter 11." *Sandy Ridge I,* 881 F.2d at 1354.

> *The Bankruptcy Code, however, does not protect a secured creditor's upside potential*; it protects the "allowed secured claim." If a creditor were over-secured, it could not demand to keep its collateral rather than be paid in full simply to protect the "upside potential." Further, indubitable equivalence does not require more protection than is afforded by the preceding clauses in § 1129(b)(2)(A). [Emphasis added.]

*Id.* at 248.[9]  Indubitable equivalence is not a guarantee of future results, nor does it require an elevated proof criteria, elevated protections, or elevated allowance considerations.  *See, Pacific Lumber, infra.*

### ii.      Protection of the "interest" is all that is required

13.      "The generally accepted meaning of th[e] word ['indubitable'] is 'too evident to be doubted.'"[10]  The over-secured creditor is entitled to adequate protection only of ***its interest***. Thus, "[t]here is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected."  *Matter of James Wilson* Assoc., 965 F.2d 160, 171 (7th Cir. 1992).[11]  Put in other words, a secured creditor does not own the building or the rents that that building throws off month after month, year after year. It is just a creditor with a claim that it has secured with liens against the building, and against the rents, to assure repayment.  "It has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest. 11 U.S.C. §§ 362(d), 363(e)"  *In re Hanna,* 912 F.2d 945, 951 n. 9 (8th Cir. 1990).

---

[9]      *See also, In Matter of Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988) ["The valuation of the assets of a debtor in bankruptcy, . . . is an integral part of the confirmation process under Chapter 11. *Id.* at 1165].

[10]      *In re Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 448 (Bankr. N.D. Ga. 1994) (quoting *Webster's New Collegiate Dictionary* 583 (1979)); *accord In re Walat Farms, Inc.*, 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987) (quoting *Webster's Ninth New Collegiate Dictionary* (1985)).

[11]      Moreover, "a plan that includes the partial return of collateral may be confirmable under certain circumstances. One circumstance occurs where, as here, the creditor is oversecured and the value of the surrendered collateral is equivalent to the amount of the creditor's claim." *Matter of Atlanta S. Business Park, Ltd.,* 173 B.R. 444, 449 (N.D.Ga. 1994). "A security interest is -- a security interest. It is not fee simple." *Matter of James Wilson* Assoc., 965 F.2d 160, 171 (7th Cir. 1992). Moreover, an oversecured creditor "has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest ... There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected ..." *Id. See also, Matter of May,* 179 B.R. 832, 840 (S.D.Ga. 1994) (surrender of less than all townhouse units was indubitable equivalent of secured claim).

*See, also, In re Revco D.S., Inc.,* 901 F.2d 1359 (6th Cir. 1990); *In re Senior Care Properties, Inc.,* 137 Bankr. 527 (Bankr. N.D. Fla., 1992).

14.    Critical to this observation is the rule, recited in *BFP v. Resolution Trust* 511 U.S. 531 (1994): "In short, 'fair market value' presumes market conditions that, by definition, *simply do not obtain in the context of a forced sale*." [12]    [Emphasis added]. Note, that *BFP,* acknowledged that states have enacted separate and distinct statutes (the "Deficiency Statutes") to deal with this reality[13] – statutes that do not set aside the foreclosure results but restrict the creditor's right to enforce the unjust and unfair result. *Sandy Ridge I,* 881 F.2d at 1354 made reference to the reality that *"*[a]lthough valuation hearings can be tedious, the valuation of assets is often necessary to define and protect the rights of the parties and is "an integral part of the confirmation process under Chapter 11."

---

[12]    *Citing See, e.g., East Bay Municipal Utility District v. Kieffer,* 99 Cal.App. 240, 255, 278 P. 476, 482 (1929), overruled on other grounds by *County of San Diego v. Miller,* 13 Cal.3d 684, 119 Cal.Rptr. 491, 532 P.2d 139 (1975) (in bank); *Nevada Nat. Leasing Co. v. Hereford,* 36 Cal.3d 146, 152, 203 Cal.Rptr. 118, 121, 680 P.2d 1077, 1080 (1984) (in bank); *Guardian Loan Co. v. Early,* 47 N.Y.2d 515, 521, 419 N.Y.S.2d 56, 60-61, 392 N.E.2d 1240, 1244 (1979).

[13]    The dissent in *BFP vs. Resolution Trust Corp.,* 511 U.S. 531, 114 S.Ct. 1757 (1994) in its opinion quoted above recognized that Texas foreclosures resulted in depressed values received.  Likewise, the dissent's analysis of the overruling the *Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (5th Cir.1980) line of cases cited the Texas Deficiency Statute § 53.003 as enacted to enforce a public policy distinct from unwinding the bid results of a foreclosure, dealing with the potential for the secured creditor to receive artificially low valued property (by the no-delay, no appraisal, no marketing Texas law of non-judicial foreclosure) then collect the artificially created deficiency from the borrower (or the borrower's Title 11 U.S.C. § 101 estate):

> Evidently, many States take a less Panglossian view than does the majority about the prices paid at sales conducted in accordance with their prescribed procedures. If foreclosure-sale prices truly represented what properties are "worth," *ante,* at 1762, or their "fair and proper price," *ante,* at 1765, it would stand to reason that deficiency judgments would be awarded simply by calculating the difference between the debt owed and the "value," as established by the sale. *Instead, in those jurisdictions permitting creditors to seek deficiency judgments it is quite common to require them to show that the foreclosure price roughly approximated the property's (appraised) value. See, e.g., Tex.Prop.Code Ann. §§ 51.003-51.005 (Supp.1992)*; see generally *Gelfert v. National City Bank of N.Y.,* 313 U.S. 221, 61 S.Ct. 898, 85 L.Ed. 1299 (1941); cf. *id.,* at 233, 61 S.Ct., at 902 ("[T]he price which property commands at a forced sale may be hardly even a rough measure of its value"). *Id.* at 556, note 7.  [Emphasis added].

15.     An example is *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997) in which the Supreme Court dealt with the correct "valuation" of an undersecured Secured Claim against a truck and specifically rejected

> ". . . a ruleless approach allowing use of different valuation standards based on facts and circumstances of individual cases. *Id*. at 964, n.5.

The court established, in a case of collateral retained by the debtor, § 506(a) directs application of a replacement-value standard rather than a foreclosure-value standard, or something in between. *Id*. at 955-956. This is equivalent to "fair market value" defined by the Court as

> "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of a like age and condition. *Nash* at 959 n. 2.[14]

16.     Likewise, retaining the "market value" approach, in *Till v. SCS Credit Corp*. 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) the Supreme Court held that a cramdown of an under-secured Secured Claim on a truck required an interest rate determined by a formula approach whereby the bankruptcy court starts with the prime rate and adjusts upward for risk, [*Id* at 508] with the dissent adopting the contract rate as the presumptive rate.[15]

17.     Bankruptcy Courts simply cannot work from the premise that their own valuation determination must never been wrong, or that it must always have an out for the secured creditors. In fact, courts have confirmed plans that provide for only a partial surrender of collateral based on the provision for cash payments to satisfy any deficiency in the value of the

---

[14]     However, the Court also held that "[w]hether replacement value is the equivalent of retail value, whole sale value, or some other value will depend on the type of debtor and the nature of the property." Id. at 965 n.6.

[15]     The majority opinion required Justice Thomas's concurrence, that the Code does not require a debtor-specific risk adjustment. *Id*. at 486 [Thomas, J., concurring].

> "Justice Thomas buttressed his position by noting that under Rash, 'secured creditors are already compensated in part for the risk of nonpayment through the valuation of the secured claim' because Rash 'utilized a secured-creditor-friendly replacement-value standard rather than the lower foreclosure-value standard for valuing secured claims when a debtor has exercised Chapter 13's cram down option.'" Id at 486-487 [Thomas, JH. concurring]. *See*, Kenneth Klee, Bankruptcy and the Supreme Court, pg. 405.

Page 11

property surrendered, and the retention of liens in the remaining property until the claim is paid in full. *See In re Simons*, 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990).

18.     The "degree of certainty" is not a unique criteria to valuation determinations by the bankruptcy court.  Several areas of the bankruptcy code shift the "risk" made as a result of discretionary determinations by the bankruptcy court in the confirmation process.  The best example of this deals with the confirmation requirement of "feasibility" of the plan.   This critical determination must be made because the plan shifts risks among and between multiple participants – and binds them, often in the since of an adhesion contract called a plan, to the future of their financial recovery.   In making a determination of "feasibility" there are numerous sub-parts to be considered, including future management, future operations, future markets and economic factors, all toward the determination of the plan's feasibility and shifting the risk of reorganization.

19.     The issue of "value" is the determining factor in substitution of collateral cases. In *In Matter of Sun Country Development, Inc*., 764 F.2d 406,  (5th Cir. 1985) the Fifth Circuit allowed the debtor to substitute the notes it generated from the sale of the bank's collateral as a substitute for the underlying lien on the property.  The plan provided for release of the secured creditor's first lien on 200 acres of property.  In exchange, the plan gave the creditor 21 separate secured notes secured by 21 separate lots. The district court held that the notes at their face value were the indubitable equivalent.  *Id*. at 409.

> "At a hearing before the bankruptcy court, Sun Country presented evidence that the present value of the notes was $153,777.06, over $200 more than the debt. Sun Country also presented evidence that the value of the lots securing the notes was $287,500.  At the same hearing, Brite presented evidence that the notes could be sold for only thirty to fifty percent of their face value because of the debtors' poor payment histories on the notes. After adopting the evidence presented by Sun Country as part of the facts, the bankruptcy court held that the notes were the

> indubitable equivalent of the first lien on the 200 acres.  *Id*. at 409. ". .
> Brite has taken over collection of the notes, the debtors have generally
> kept their payments on notes current. Furthermore, if debtors do default on
> their notes, the value of the land securing the notes, as found by the
> bankruptcy court, appears sufficient to cover the additional expense of
> foreclosing on twenty-one separate properties. *Id*. at 409.

The Court required proof of the current fair market value of the notes and the fact that the notes had both income and underlying collateral supported the finding that the face value was the fair market value.

20.     As the Trust suggests, the debtor's burden of proof has been described as more than "preponderance of the evidence" and more than even "beyond a reasonable doubt," but rather the "indubitable equivalence" of a cash payment.[16]  As held by the Fifth Circuit, this is not the case:

> The combination of legislative silence, Supreme Court holdings, and the
> structure of the Code leads this Court to conclude that preponderance of
> the evidence is the debtor's appropriate standard of proof both under §
> 1129(a) and in a cramdown. FN26
> FN26:  Heartland suggests that because the word "indubitable" (meaning,
> according to Webster, "too evident to be doubted; unquestionable") is
> used in the fair and equitable requirement of § 1129(b), a cramdown
> requires more than preponderance. Heartland is confusing the issue. §
> 1129(b)(2)(A)(iii) states that "With respect to a class of secured claims,
> the plan provides ... for the realization by such holders of the indubitable
> equivalent of such claims." Under this option, the debtor must show that
> the creditor will receive the indubitable equivalent of its claims by a
> preponderance of the evidence. *The level of proof to show indubitability
> is not raised merely by the use of the word "indubitable". "Indubitable"*

---

[16]     The court in *In re Walat Farms*, 70 B.R. 330 (Bankr. E.D. Mich. 1987), referred to as "the preeminent judicial commentary on the effect of valuation risks on confirmation of asset payment plans," [*Lurey*, at 351] also fretted over market conditions:

> No matter how hot the market for real estate may become in the future, the market for farm real
> estate here and now is not such which would permit us to hold that the value of the land being
> offered is the indubitable equivalent of [the secured creditor's] claim. *Id*. at 334.

The *Walat Farms* court suggested that "since we are in a deflationary market environment, the longer it takes to sell the property, the less likely it is that the surrender of the land will be the equivalent of the claim." Id. at 337, n.8. The court based this on the fact that the word "indubitable" has been held to mean something that is "too evident to be doubted." *Id*. at 335 (citing Webster's Ninth New Collegiate Dictionary (1985)). However, these cases that suggest that the burden to prove "indubitable equivalent" is somehow greater than the burden to prove cramdown under the other two criteria overstate the burden.

modifies *"equivalent"* not *"provides"*. Section F discusses the debtor's satisfaction of the fair and equitable requirement. *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160 (5th Cir. 1993). [Emphasis added.]

### iii.    The Fifth Circuit Expresses A Willingness to Accept A Margin of Error in Value Assumptions

21.    Courts recognizes that "valuation of assets is often necessary to define and protect the rights of the parties and is an 'integral part of the confirmation process under Chapter 11.'" *In re Park Forest Development Corp.*, 197 B.R. 388, 396 (Bankr. N.D. Ga. 1996) (quoting *Sandy Ridge Development Corp. v. Louisiana National Bank*, 881 F.2d at 1354).    In a thorough analysis, the Court in *Park Forest* makes special note that valuation *is required, not advisory*, in almost all aspects of a Chapter 11 case, and is often the tool used by the secured creditor to obtain its collateral, or to prove that it has a deficiency claim allowable under the Code:

> Although valuation hearings can be tedious, the valuation of assets is often necessary to define and protect the rights of the parties and is "an integral part of the confirmation process under Chapter 11." *Sandy Ridge I,* 881 F.2d at 1354. In rejecting a creditor's argument that the bankruptcy court cannot set the value of property but must allow the foreclosure sale market to determine its price, the Fifth Circuit stated: "Although we recognize that property valuation is not an exact science, it remains an integral part of the bankruptcy process." *Id.  Id. Park Forest* at 396.

22.    In every real estate Chapter 11 case, every secured creditor subject to a payout runs the risk of future markets and future operations.  What looks like a feasible plan based upon reasonable assumptions of value today could change such that the secured creditor's debt is not paid and the collateral it ultimately has (being all the collateral it may ever had had) has diminished in value.  Thus, nothing in the Code provisions of § 1129(b) mandate a guarantee – just as the finding of future feasibility is not required to be proven under a standard of a guarantee of success by the debtor.  However, this is not a suggestion that some higher standard should be applied in the Court's analysis -- the Fifth Circuit in *In re Briscoe Enterprises, Ltd., II*,

' 994 F.2d 1160 (5th Cir. 1993) wrote that

> "the debtor must show that the creditor will receive the indubitable equivalent of its claim by a preponderance of the evidence. *The level of proof to show indubitably is not raised merely by the use of the word 'indubitable*." *Id*. [Emphasis added.]

23.      *In re May*, 174 B.R. 832 (Bankr. S.D. Ga. 1994), involved a plan proposing to convey a portion of a creditor's collateral that provided the creditor, after a judicial determination of value, with only a 1.5 percent margin or error.  *Id*. at 836.   Stated differently, the value set by the court exceeded the creditor's claim by only 1.5 percent.  The court confirmed the plan and noted that

> '*risk is present in any case in which a court is required ... to make a ... determination of value*' and that it could not "be the guarantor of the values it sets during the course of a bankruptcy case." *Id*. at 839-40 [Emphasis added.]

In *In re Atlanta Southern Bus. Park Ltd*. the court was faced with the issue of whether valuation should be determined as of the confirmation date or at a later date when the secured creditor was ultimately able to sell the collateral. *Id*. at 449.   The court rejected the secured creditor's argument that the sale date controls, pointing out that "when valuation is for the purpose of plan confirmation, the value must be determined as of the date the plan is confirmed ... [and] [n]othing in the Code requires the Court to treat a valuation in an indubitable equivalent situation any differently." *Id*. at 450.

### iv.    Valuation (and any deficiency claim) Is Guided By the § 1129(b) "Fair and Equitable" Test for Cramdown

24.      Surrender of collateral and the "fair and equitable" are certainly joined at the hip. If an unsecured deficiency claim exists under § 506(a) the plan must also meet the Code's requirements for conformability (under §§ 1129 or 1225) with respect to the unsecured portion. Among other things, the plan must follow the absolute priority rule with respect to classes junior,

including to participation of an unsecured deficiency claim.   Thus, the opposite is also true – the estate does not get a special consideration when the Secured Creditor is over secured.

25.     This is so because the common theme in confirmed "surrender of collateral" plans is assurance of payment and proper valuation, *particularly when the creditor is over-secured*.[17] Where collateral is to be returned to the Secured Creditor having equity, it is generally the requirement that the estate retain the benefit of the over-payment (or value of the "equity") and this may be done out of that collateral itself. This is a bifurcation of the claim between fully secured (the indubitable equivalence of the interest in the collateral), and the "over secured" portion.   The "fully secured" portion must be valued and must account for the "indubitable equivalent" of the secured creditor's interest in the collateral in order for the estate to retain any interest.   The Secured creditor has no right to protect an "equity cushion" post confirmation. *See, Pacific Lumber, infra*.[18]

26.     However, when a debtor demonstrates sufficient value returned to the creditor to satisfy the secured creditor's interest in the collateral in full, then one of two events must result:

      a.     the secured creditors is "paid in full" <u>with no deficiency claim</u> <u>and with no over-payment</u>;  (*i.e.*, the fair market value of the collateral equaled the secured debt);   or

---

[17]     *Cf, early case holdings; In re Wieberg*, 31 B.R. 782, 785 (Bankr. E.D. Mo. 1983) (where the court denied confirmation of a plan that proposed, in full satisfaction of a secured creditor's claim, to transfer to the secured creditor cash and several tracts of land subject to the secured creditor's lien because a deficiency claim of more than $300,000 would remain with little chance of payment thereon); *see, also, In re Walat Farms Inc*., 70 B.R. 330, 334-36 (Bankr. E.D. Mich. 1987) (where the court denied confirmation of a plan that proposed the surrender of approximately 400 acres to the secured creditor in exchange for discharge of the mortgage, thereby stripping the secured creditor's lien on the remaining secured acreage, *because of doubts over valuation*).

[18]     *Pacific Lumber* at 248:
    "The Bankruptcy Code, however, does not protect a secured creditor's upside potential; it protects the "allowed secured claim." If a creditor were over-secured, it could not demand to keep its collateral rather than be paid in full simply to protect the "upside potential." Further, indubitable equivalence does not require more protection than is afforded by the preceding clauses in § 1129(b)(2)(A)."

       b.     the secured creditor is "paid in full" when it receives a partial surrender of collateral thereby retains no deficiency claim but the estate must retain the equity portion of the collateral (equivalent to the "equity" or overpayment on the secured claim.)

*In re May*, 174 B.R. 832, 836-40 (S.D. Ga. 1994); *see, also, In re Atlanta Southern Business Park Ltd.*, 173 B.R. 444, 449 (Bankr. N.D. Ga. 1994)].  Under such circumstance as a. above, the debtor no longer owes any of the debt and the secured lender is free to realize upon the value of its collateral.    Under circumstance b., the debtor no longer owes any of the debt, but has the right to the equity – that is, to use the retained collateral for its reorganization, free from the secured creditor's lien, or receive in some other fashion the value of that equity for use in the reorganization (or the "fair and equitable" test has not been met because the secured creditor was overpaid at the expense of the junior class of unsecured creditors).    Collateral surrender plans, in this event, will usually return only a portion of the collateral equal in value to the secured debt.

      27.    This logical and legal conclusion prohibiting overpayment of a secured creditor is illustrated in *In re Park Forest Development Corp.* 197 B.R. 388 (Bankr. N.D. Ga. 1996).  The Debtor owned three parcels of real property that they had pledged to PNC Bank, N.A., as security for an indebtedness of approximately $6.7 million. The debtors' plan proposed that the court would value the three parcels and the debtors would convey two of the three parcels directly to PNC. If, after the court's valuation, it was determined that the two transferred properties were worth less than the total amount of PNC's claim (approximately $6.7 million), then the debtors would either:  (1) pay the balance remaining in cash; or  (2) transfer the third property to PNC, the value of which would be credited against the amount outstanding. The Secured Creditor objected even before a hearing on valuation, to the plan's confirmation, alleging among other things that the plan is not "fair and equitable" and discriminates unfairly. §

1129(b)(2)(A) and § 1129(b)(1).   Actually the secured creditor argued that such a Plan cannot be confirmed no matter the value of the collateral.   PNC's strategy in asking the bankruptcy court to rule on its objections without first valuing the parcels, was designed to avoid a valuation that could adversely affect a concurrent district court action against the non-debtor guarantors, and to hopefully obtain a ruling that the structure of the suggested plan payment violated the code.[19]

28.   The bankruptcy court, however, found that its determination as to whether the plan unfairly discriminated or was fair and equitable actually depended upon the value of the returned collateral.   Specifically, the court found that, by definition, PNC would receive the indubitable equivalent of its secured claim (and thus the plan would be fair and equitable with respect to such claim) if PNC received all three parcels (all of its collateral).  *Id*.   The Court shortcut PNC's strategy by finding that until the property was valued, however, it would be unclear whether PNC would receive all three parcels or only two.   Finally, the court found that it must value the three parcels in order to determine whether an unsecured deficiency claim existed. Otherwise, the court could not determine.

> "whether the unsecured deficiency is being treated so differently from other unsecured creditors as to constitute unfair discrimination, and whether the plan is fair and equitable [with respect to the unsecured deficiency claim]."
> *Id.*

Thus, the Court adopted the valuation approach that could lead to a partial return of collateral in full satisfaction of the secured debt.

29.   It is the prohibition of overpayment of a secured claim, and the prohibition of

---

[19]     As to Guaranty actions, note, however, in denying a petition for rehearing, the Fifth Circuit emphasized that its opinion did not determine the legal effect of the valuation of the returned collateral in any action against the guarantors. *Matter of Sandy Ridge Development Corp.*, 889 F.2d 663, (5th Cir. 1989). Accord, *In re Coral Petroleum, Inc.*, 60 B.R. 377, 381 (Bankr. S.D. Tex. 1986). See In re FCX, Inc., 853 F.2d 1149 (4th Cir. 1988) (debtor can use § 1123(a)(5)(D) to return property notwithstanding nonbankruptcy matter of restrictions on such redemption of an agricultural cooperative's patronage dividend certificates); In re Elm Creek Joint Venture, 93 B.R. 105 (Bankr. W.D. Tex. 1988).

unfairly shifting the risk of realizing the value attributed to the surrendered collateral that becomes the disputed valuation issue.  The estate of creditors is entitled to the benefit of the "equity" and the secured creditor is entitled to its collateral until paid in full.  Importantly, bankruptcy policies and the Texas Deficiency statutes support both goals by mandating that the "fair market value" of the collateral be determined at the time of the surrender, notwithstanding the results of the subsequent foreclosure.  "[I]n contrast, the amount of collateral deemed to be the indubitable equivalent of [the oversecured creditor's] claim depends entirely on the court's valuation of the collateral." *In re Arnold & Baker Farms*, 85 F.3d 1415, 1423 (9th Cir. 1996).

> **v.** **Any Valuation Should Be Consistent With the Texas Deficiency Statute's Mandate of "Fair Market Value" and Not Some Mandate to Reduce Fair Market Value**

30.   Two years prior to the Texas Deficiency Statue, Judge Monroe approved the "fair market value" approach *In re Peerman*, 109 B.R. 718 (Bankr. W.D. Tex. 1989).[20]  In

---

[20]   Judge Monroe's opinion in *In re Simons*, 113 B.R. 942 (Bankr. W.D. Tex. 1990) involved a debtor that wanted to pick the collateral to be returned (even though this would not pay the secured claim in full) and keep the remainder of the collateral and pay the balance of the debt over time.  Judge Monroe framed the issues as:

> Is it fair and equitable to the Lesters under § 1129(b)(2)(A) for the Debtors to return only part of a secured creditor's collateral for credit on the debt and pay the balance over time?
> What is the value of the 131 acres?
> Id. at 946.

Judge Monroe believed that ". . . it is a question of first impression as to whether less than all of the collateral may be surrendered to the secured creditor as a credit upon and as cancellation of only a portion of the secured claim and the remainder paid over time?"  *Id.*   Noting the way the proposed plan was to be analyzed involved not only the indubitable equivalent standard, but also the alternative method of retention and cash payment:

> Here, two of the alternative provisions have been used. First, § 1129(b)(2)(A)(iii) is utilized in order to return the 131 acres to the Lesters for a corresponding credit on the secured claim. Second, § 1129(b)(2)(A)(i) is used with regard to the property being retained. This *947 is not a per se violation of the fair and equitable rule as embodied in § 1129(b)(2) of the Bankruptcy Code.
> *Id.* at 946 – 947.

Although the Court held that the surrendered collateral was easily divisible and could easily be sold in a single unit. "To adequately protect the Lesters' secured claim (which is oversecured) the valuation of the portion to be returned should be on a conservative basis" because that the retained collateral had highway frontage, but the 130 acres had only a 50' easement for its frontage.  Additionally, the court observed:

> The only redeeming feature of the 131 acres is a 15-acre canyon which has the only fertile land in the entire tract. The canyon is also well suited to hunting. Other factors affecting value are that approximately 30 acres of the land are overgrown with cacti; approximately two-thirds of the land is extremely rocky; even with an easement, access to the highway is one and one-half miles away; and utilities are available within 300 yards of the site. *Id.* at 948.

*Peerman*, the Debtor proposed to return real property to the secured creditor.  The court then analyzed how to value the property given its highest and best use, according to normal appraisal techniques.  The court valued the property based on its fair market value, including property that, in order to realize its highest value, would have to be held by the creditor for a period of time. In so doing, the court noted:

> Under the circumstances, both the sale of the property as a whole or the holding of such property as an investment for ultimate development of single family residential lots is a means of disposal reasonably available to this lender.  *The ultimate choice will lie with the Secured Creditor. However, the Secured Creditor makes that choice at her own risk when both are reasonably available…*

*Id*. at 722-23 (emphasis added).  These are the criteria of the Texas Deficiency statutes and recognizes that the highest and best use is a consideration.  *See, also In re Taffi*, 96 F.3d 1190 (9th Cir. 1996), cert. denied, 117 S. Ct. 2478, 138 L. Ed. 2d 987 (U.S. 1997) (holding that in Chapter 11 context, confirmation value of secured claim is measured by fair market value with no deduction for hypothetical foreclosure and repossession costs); *See also In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995) (holding that in Chapter 11 confirmation value is measured by "fair market value" rather than liquidation value).

31.     This opinion makes an important, and intuitive, point.  The secured creditor, given its collateral, will make its own decision on the future because the value has been set.  It is notorious that secured creditors claim to not be "in the business" of operating properties, or selling properties, when that position allows a depressed foreclosure price.  If in fact the secured creditor decides to "liquidate" its position notwithstanding its "fair market value" if property

---

With all of this cherry-picking of collateral by the debtor, and based on the lack of value of the locked-in acreage, the Court found liquidation value was an appropriate valuation where

> ". . .  the secured creditor can only liquidate it, 10% cost of sale should be deducted to cover realtor's fees, title policies, etc. The arithmetic on this works out to be a net value of $70,740.00 which shall be credited against the secured claim of the Lesters.  *Id*.

Under these circumstances, the court was holding that the "fair market value" and the "liquidation value" was the same.

handled, the secured creditor has that absolute right.  What the secured creditor does not have is the right to liquidate, and then require the Title 11 estate to make up the difference. Judge Monroe made the observation with respect to the "highest and best use" of both developed and partially developed real estate:

> The highest and best use for Fitzhugh Corners and Fitzhugh Place, Phase I is for the sale of the developed lots to end users. With regard to Fitzhugh Place, Phase II, the highest and best use is the retaining of ownership of the property as an investment for ultimate development into single family residential lots. The fact that the real property will be owned by the Secured Creditor, as opposed to this Debtor, or any other entity, does not alter the highest and best use of the property.  *Id*. at 721.

In *In Re Raylin Development Co.,* 110 B.R. 259, 263 (1989) Judge Clark likewise determined the value was "fair market value" based on the highest and best use,[21] and not a liquidation value as in the hands of the secured lender for foreclosure, and further buttressed his result stating that, "[u]nsecured creditors have a right to expect, to count on, and the benefit from prudent disposition by under secured creditors of their collateral".  *In Re Raylin Co.,* 110 B.R. 259 at 262.  In other words the "fair market value" valuation is made

> on the basis that Collecting Bank should be forced to accept the collateral and give a corresponding credit to the bankruptcy estate roughly equal to what it would be able to receive through disposition of such collateral in the most commercially reasonable manner practical under the circumstances citing *In re American Kitchen Foods, Inc.,* 2 B.C.D. 715 (Bankr.D.Me.1976).

---

[21]    In *Raylin,* Judge Clark found that the most commercially reasonable manner of disposing of the property for Collecting Bank would be for it to act as the developer of the property; accordingly, Judge Clark reasoned that the value thereof should be determined from the standpoint of an investor and, therefore, used "an investment value approach" (IVA) to determine value. Judge Clark stated with regard to the IVA approach that,

> "It hypothesizes an *actual* economic use of the property, then searches for the value each of the respective parties could realistically expect to realize exploiting the hypothesized land use. It is easier to incorporate risk factors under this model evaluation, and so easier for the Court to do the job imposed by Section 506(a). At the same time, however, because IVA posits value from the point of view from the particular seller, it assumes that the creditor can make use of the land use proposal upon which it rests. Therefore, in order to apply the IVA valuation approach here described, we must first decide whether the proposed land use is indeed realistic and consistent with highest and best use of the property. We must then decide whether the means will yield the most net value. Finally, we must decide whether marketing this property in accordance with that proposed land use is a means of disposal of the proposal of the property reasonably available to the lender."

The lazy secured creditor's approach, or the "I'm not able to realize the fair market value, I'm only a bank", *etc*. excuse, does not bind the estate to accept the loss. The secured creditor has the right and opportunity to realize the fair market value, or not. *In re Peerman*, 109 B.R. at 721. Any secured lender's argument that "much like beauty is in the eye of the beholder, so value (of collateral) is in the hands of the holder. Presumably value could therefore differ depending solely upon whose hands are holding the collateral." *Id.* at 722.

> "What about if the secured creditor was a widow, a real estate developer, a guardianship estate for a minor child, a doctor, a church, a blind man, a government agency, etc.? The list is endless.
> . . .
> However, this Court feels (and interprets *Raylin* to mean) that § 506 requires the following inquiry in the following order:
>   1)    What is the highest and best use of the collateral?
>   2)    What use of the collateral will yield the highest net value?
>   3)    Are 1) and 2) the same? (Presumably, these two will generally be the same.) Here they are by definition as the Secured Creditor's expert defined highest and best use as, "that reasonable and probable use that will support the highest present value, as defined as of the effective date of the appraisal." Petmecky Exhibit 12 at p. 16.
>   4)    Is that use reasonably available to the lender?

*Id.* at 722. The court rejected the lender-excuse and found that the "fair market value" remained as the value whether in the hands of the debtor or the hands of the lender. *See, also In re Stockbridge Properties I, Ltd*., 141 B.R. 469, 471 (Bkrtcy. N.D.Ga., 1992); *In re El Paso Truck Center, Inc.,* 129 B.R. 109, 21 B.C.D. 1432, 1433 (Bankr.W.D.Tex.1991) (quoting 12 C.F.R. § 34 (1990); *In re Melgar Enterprises, Inc*., 151 B.R. 34, 40 (Bkrtcy. E.D.N.Y., 1993) [valuation is at fair market value considering the highest and best use].

32.    *In re Perry*, 394 B.R. 852 (Bkrtcy. S.D. Tex., 2008) [Judge Bohm] is an interesting case dealing with an attempt by the debtor to use abandonment of secured property in full satisfaction of a secured claim outside the plan, and by motion. The Court emphasized that

its conclusion that Amegy had no unsecured claim would be subject to change if Amegy decides to foreclose in the wake of abandonment of the Property.[22]  Amegy has the right to foreclose its lien pursuant to applicable Texas law.  The Court put in place a procedure for Amegy to come back and re-prove its claim.  The Court recognized that a secured creditor might game the system by not promptly conducting a sale and could elect to wait to foreclose, now having this ability to come back and re-prove its unsecured claim, so the Court made the return trip a limited right:

> Amegy will not, however, have the luxury of foreclosing whenever it so chooses. This Court has a duty to ensure that its cases, including this case, are prosecuted timely and fairly, taking into consideration the interests of all creditors, all parties-in-interest, and the Debtor. Accordingly, Amegy will have 120 days to conduct a foreclosure sale on the Property. If it does not do so, then Amegy's unsecured claim will be set at zero based upon the finding that the value of the Property at this time is $196,500.00.  This zero figure will be used for claims estimation and voting purposes in the plan confirmation process.

Had the issue been raised, it is clear that the Texas Deficiency statute would be a consideration in dealing with any attempt to prove in the future a deficiency claim after foreclosure.[23]

---

[22]     Although this Court used the judicial admissions of Amegy and the Debtor to make a finding that the value of the Property is presently $196, 500.00, this value is only for purposes of this specific contested matter and does " 'not have a *res judicata* effect' on subsequent hearings." *In re Snowshoe Co.,* 789 F.2d 1085, 1088-89 (4th Cir.1986) (quoting S.Rep. No. 95-989, 95th Cong., 2d Sess. 54, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5840). Indeed, courts have recognized that the value of collateral may change between the time a claim is allowed or filed and the time that a foreclosure sale is held. *Dewsnup v. Timm,* 502 U.S. 410, 418, 112 S.Ct. 773, 116 L.Ed.2d 903(1992). Thus, if Amegy holds a valid foreclosure sale and the highest bid is $150,000.00, there is no reason why this Court could not re-value the Property at $150,000.00 so as to allow Amegy to have an unsecured claim of $39,524.13. As one court has stated, "a bankruptcy court faced with the need to re-value collateral should not 'mechanically appl[y] the valuation determination in the earlier proceeding,' but should make an independent evaluation of the value of the collateral." *Snowshoe,* 789 F.2d at 1089; *see also In re Midway Partners,* 995 F.2d 490, 494 (4th Cir.1993).  *Id.* at 857

[23]     *In re Perry,* however, completely misinterprets the holding in BFP, and totally ignores the existence of how an unsecured deficiency claim is proved as an unsecured claim in a Title 11 case.   The Court put in place a procedure for Amegy to come back and re-prove its claim.

> The Court will afford Amegy the opportunity to do so.  If Amegy decides to avail itself of this opportunity, then its unsecured claim will be determined by the results of the foreclosure sale-as long as Amegy conducts the sale pursuant to applicable Texas law. *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (*holding that so long as the lienholder complies with state law in holding a foreclosure sale, then the sale is valid and the amount received at the sale is a fair and proper price*).  *Id.* at 858.

BFP only holds that the price at a foreclosure sale is not subject to the § 548 fraudulent transfer attack based on less than a "fair equivalent value."   BFP makes no attempt to bless that amount and otherwise an "affirmative" enforceable claim, particularly in face of the Texas Deficiency statute.  And as noted above, *BFP* even mentions the fact that the Texas Deficiency statute, and others, were enacted because the State of Texas knew that the foreclosure

**III.**
**CONCLUSION**

33.    It is clear that in the Fifth Circuit, a lender (much less a vulture fund that is not a lender but seeks a windfall profit at the expense of the unsecured creditors) is not entitled to protection by this Court's determination of a lower or "conservative" value, nor is such determination subject to a weighing of the value to favor one party over the other.  It is a single determination of value for the purposes of indubitable equivalence.

34.    Finally, the Debtor, and this Court, are clearly not able to deal with the absence of information that should be considered in dealing with the Trust's own due diligence particularly in a case where the spread of valuation offered by the parties is so dramatic.   It is the Trust that raised the issue of its "risk" and accordingly, the Trust must produce not only the documents previously ordered, but also the price paid for this investment, to determine if the true risk is the risk of a diminished windfall that results from a successful defeating of the Debtor's Plan, recovery of the Hospital property, and pursuit of a deficiency claim.   No public policy would allow a party, such as a vulture fund, to demand risk protection from the Court, yet refuse to show the Court its true risk.

35.    The Pineda Trust should be ordered to produce to the Debtor its due diligence documents as well as produce the purchase price paid in response to the Debtors right to defend against the Trusts argument of risk and risk shifting.

---

price was not a "fair and proper price" if a deficiency was to be collected.  For Amegy to return to bankruptcy court after foreclosure, and be given a pre-approved deficiency, is simply wrong and opens the estate to the inability to prove that the deficiency claim meets the "fair and equitable" test, or does not violate the absolute priority rule. Judge Bohm was not faced with these questions and thus his remarks were purely dicta, unless and until Amegy returns to Court.

WHEREFORE, the Parties in Interest support confirmation of the Debtor's Plan and this Courts evaluation on behalf of the Debtor consistent with the valuation rules of this Court, and for such other and further relief to which these Parties in Interest may be justly entitled.

Dated:  April 14, 2014.

Respectfully Submitted,

/s/ Shelby A. Jordan
Shelby A. Jordan
Texas Bar No. 11016700
Federal Bar No. 2195
Antonio Ortiz
Texas Bar No. 24074839
Federal Bar No. 1127322
**Jordan, Hyden, Womble, Culbreth & Holzer, P.C.**
500 North Shoreline Dr., Suite 900
Corpus Christi, Texas 78401
Telephone:  (361) 884-5678
Facsimile:  (361) 888-5555
**ATTORNEYS FOR C. LYNN ANDERSON, JR. AND VICKI MILES RODRIGUEZ**

## CERTIFICATE OF SERVICE

I certify that on April 14, 2014, a true and correct copy of the Notice of Appearance was served via electronic means as listed on the Court's ECF noticing system.

/s/ Shelby A. Jordan
Shelby A. Jordan