IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BROWNSVILLE MD VENTURES, LLC, | § § § | CASE NO. 13-10341 |
| | § | CHAPTER 11 |
| DEBTOR. | § | |

**PINEDA GRANTOR TRUST II'S REPLY TO RESPONSE AND OBJECTION OF
C. LYNN ANDERSON, MD and VICKI MILES RODRIGUEZ, GUARANTORS**
*(Response to Document #195 )*

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Pineda Grantor Trust II ("Pineda") a secured creditor of the debtor who has objected to the First Amended Chapter 11 Plan of Reorganization and would show unto this Honorable Court as follows:

## I.
## PROCEDURAL BACKGROUND

Pineda has previously filed an objection to the First Amended Chapter 11 Plan of Reorganization of Brownsville MD Ventures, LLC. A confirmation hearing was held on April 1, 2014. During such hearing, the Court heard testimony and argument concerning valuation of the real property which is the sole asset of the Debtor. After the parties had presented their closing arguments, counsel for Guarantors C. Lynn Anderson, MD, and Vicki Miles Rodriguez, requested that they be allowed to present a brief concerning valuation of the property. The Court granted such request and further granted Pineda time to respond. This reply is in response to Anderson and Rodriguez' arguments and objections.

The Guarantors have taken 23 pages to say the following:

1. Valuation drives the court's determination of whether to confirm the plan.

-1-

    2.      Indubitable equivalence is the confirmation standard.

    3.      Fair market value of real property is difficult to establish and commonly results in disparate opinions from the debtor and creditors' experts.

    4.      The fair market value is the value whether in the hands of the debtor of the hands of the creditor.

Guarantors also spend three pages complaining of an incomplete record related to Pineda's failure to produce a due diligence file. As this Court realized and indeed commented on during the hearing, the purchase price paid for the secured claim is completely irrelevant in the Court's evaluation of fair market value. Indeed, the Guarantors spend page upon page defending this Court's ability to fair and equitably value the real property in question. The Court's determination of indubitable equivalent value is only assured when the Court has determined fair market value of the property.

## II.
## DETERMINING INDUBITABLE EQUIVALENCE

As the Guarantors recognize, it is the Debtor's burden to prove by a preponderance of the evidence that the secured creditor will receive the indubitable equivalent of his claim. *Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160 (5th Cir. 1993). This standard is not compromised, however, by the Court taking a conservative approach to evaluation if it is appropriate under the circumstances.

In an almost identical case, a Kansas court was tasked with the evaluation of real property in a "dirt-for-debt" plan wherein the debtor's single asset was real property. *In re Centennial Park, LLC,* No. 11-22026, 2011 WL 5520968 (Bkrtcy.D.Kan.) During hearings in the case, the *Centennial* court became aware of a wide divergence of opinion between the debtor and bank as to the value of the debtor's real property. *Id*. at *2. The court explained that both valuations

were supported by the testimony of expert, professional appraisers. The court explained that its task was therefore to determine the value of the real property in light of the conflict. The court recognized, like others, that "valuation is not an exact science." *Id.* The court further realized that compounding the difficulty is the fact that in bankruptcy cases, the value of the same property may vary with the purpose of the valuation and the proposed disposition of the property. *Id.* The court determined that under the circumstances, where the valuation was being determined for the purpose of the debtor's plan to turn the real property over to the bank with credit on the bank's claim in the amount of the court-determined value, a conservative valuation was appropriate. *Id.* The court quoted *In re Simons*, 113 B.R. 942, 947 (Bkrtcy. W.D. Tex. 1990) in the context of another "dirt-for-debt" plan:

> Valuation in these circumstances should be approached conservatively for at least three reasons. First, the Plan shifts the burden of sale of the 131 acres from the Debtors to the secured creditor. By doing so, the Debtors have shifted the risk of loss, as well as the potential for gain, to the secured creditor. In this circumstance, the potential for loss is greater than the potential for gain due to the nature of the property and the depressed nature of the existing market for the sale of this type of property in the area where the property is located. Second, the secured claimant will not be earning interest on this portion of the secured claim until such time as the property is sold and converted into cash. The secured claimant is, in effect, getting a partial payment in kind that must be turned to cash prior to receiving a return. This was not part of the original bargain. To adequately protect the Lesters' secured claim (which is oversecured) the valuation of the portion to be returned should be on a conservative basis. Third, valuation is not an exact science, and the chance for error always exist. A conservative approach should, therefore, be taken in order to protect the secured creditor in this regard.

The court's conservative approach was recognized by other bankruptcy courts in similar circumstances. *See also In re Atlanta Southern Business Park, Ltd.,* 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994)(stating in debt-for-dirt plan, "the valuation process needed to be conservative."); *In re Park Forest Development Corp.*, 197 B.R. 388, 396-97 (Bankr.N.D. Ga. 1996) (in dirt-for-

debt plan, "valuation of real estate . . . should be very conservative and allow the secured creditor an ample margin for error").

The *Centennial* court concluded that there was no question that if the proposed plan was confirmed, (1) the risk of any loss in the value of the real property would be shifted to the bank, (2) until the bank could sell the real property it would receive no interest, and (3) the Court's determination of the value of the real property is very inexact. *In re Centennial Park,* 2011 WL 5520968 at *3.

The *Centennial* court determined the market value of the real property for purposes of plan confirmation and adopted the following definition of market value: "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." *Id.* at *10.

The conservative approach to valuation used by the courts cited above does not do violence to the preponderance of the evidence standard set forth by the Fifth Circuit. It simply recognizes that in certain case, such as this, a conservative valuation is appropriate.

### III.
### EVIDENCE PRESENTED AT CONFIRMATION HEARING

At the confirmation hearing the court heard from four live witnesses presented by the parties. Debtor representative, Chester Gonzalez testified, as well as Debtor experts Gerald Teel and Eric Ziehe. Additionally, Pineda presented expert Steve Crosson to testify as to property value.

Chester Gonzalez

Mr. Gonzalez, testifying on behalf of the Debtor, testified that in April 2012, the Debtor received a contract to purchase property for a lump sum of $14,700,000. Such offer was identified as Exhibit 1.[1] Thereafter, in July of 2012, Stonebriar Minority Partners, LLC made an offer to purchase the property for a total $12,000,000 but required the Debtor to assign any claims that Debtor possessed in the construction litigation. Such offer was identified as Exhibit 2. On August 14, 2012, the Debtor responded to Stonebriar with a counter-offer to sell the property for $15,000,000 with an assignment of all claims. That counter-offer is identified as Exhibit 3. Stonebriar did not make a counter to the Debtors $15,000,000 offer to sell.

In August, 2012, the Debtor and Alamo Street Development LLC entered into a contract for sale of the property in question for $3,000,000 and an assignment of all claims asserted in the State court litigation against the construction company. The sales price was subject to the Debtor and Alamo's ability to secure a release of the deed of trust lien held by BBVA Compass Bank for no more than $12,000,000. Such contract for sale was identified as Exhibit 4. That contract was not, however, consummated.

In November 2012, the Debtor received a contract for sale from Dr. M. Pisharodi identical to the contract which the Debtor had entered into with Alamo Street Development. That contract for $3,000,000 subject to securing a release of the deed of trust lien held by BBVA Compass Bank was identified as Exhibit 6. That contract also required an assignment of all claims against the builder. On November 20, 2012, the Debtor countered Dr. Pisharodi's offer

---

[1] The exhibits referenced in the Gonzalez testimony are Pineda's exhibits admitted into evidence at the confirmation hearing of April 1, 2014.

by demanding a cash price of $15,000,000 contingent upon a release of the bank debt for no more than $12,000,000. This counter-offer contained an assignment of the claims against the builder.

In February 2013, Equity Equations, Inc. made an offer to purchase the building for $10,000,000. Such offer is identified at Exhibit 8. On February 27, 2013, the Debtor declined such offer but made a counter-proposal stating its willingness to accept $14,354,000 with an offer of $300,000 credit at closing towards the purchaser's cost of renovations. Such counter-offer is identified as Exhibit 9.

On February 27, 2013, the above offer made to Equity Equations, Inc. was extended to Stonebriar Minority Partners. Such offer is identified at Exhibit 10. On March 4, 2013, Stonebriar countered with an offer of $10,000,000 to accept the property as is, where is but free of liens. This counter is identified as Exhibit 11.

### Gerald Teel

Gerald Teel was presented as an expert appraiser by the Debtor. Mr. Teel's initial report values the property under the sales comparison approach at $19,250,000; under the cost approach at $18,890,000; and under the income approach at $18,630,000. Mr. Teel reached a final value conclusion that the property had a market value of $18,900,000, but this amount was subsequently modified to approximately $18,100,000.00 based on additional costs that William Dysart identified in his deposition.

Mr. Teel testified on cross-examination that his value assumes that the property will be un-rented for only six months and that it will only take six months to remediate the property due to the mold contamination and other problems. Mr. Teel also testified that he assumed for his

valuation that the hospital had a license, an assumption he found out was incorrect during the confirmation hearing. Significantly, Mr. Teel testified that his report and opinions do not take into consideration any offers and counter-offers to purchase the property. He further testified that he had not made an analysis of whether Brownsville needs a hospital at this time.

### Eric Ziehe

Mr. Ziehe was tendered by the Debtor as an expert real estate agent who intended to list the property for sale. He testified during the confirmation hearing that he does not have the property listed at this time but will list it for $18,000,000. He testified that there were no pending offers and that he was unaware until the confirmation hearing that the offers and counter-offers had been made to the Debtor during 2012 and 2013. On cross-examination, Mr. Ziehe testified that knowing of those offers and counter-offers he would now list the property for $15,000,000. He believed that at that price he had a good chance of selling the property by the end of 2014.

### Stephen Crosson

Mr. Crosson testified as an expert appraiser for Pineda. Mr. Crosson testified at the confirmation hearing or through his proffer that he did not employ the cost approach as it was not appropriate in valuing this property. He did, however, consider the offers and counter-offers made on the property. He did value the property using the sales comparison approach, such value being $6,300,000. He further valued the property using the income approach which yielded the value of $7,000,000. His final value conclusion for the market value of the property was $7,000,000.

It is clear that a large difference in market value was obtained by each of the competing experts. It is also clear that the Debtor's expert appraiser did not consider the offers and counter-offers made to the Debtor in 2012 and 2013 in reaching his conclusions. It is significant that the Debtors real estate agent adjusted the listing price for the Debtor's property from $18,000,000 to $15,000,000 upon hearing of the offers and counter-offers made to the Debtor.

Pineda concedes that the Court's determination of value of the Debtor's property is very inexact. However, the task before the Court is to determine the value of the property in light of the conflict which exists between the experts. As in *Centennial*, Pineda asks that the Court consider that the risk of any loss in the value of the property would be shifted to Pineda and that until Pineda can sell the property it will receive no interest.

Particularly telling are the Debtor's offers to sell the property in the two years proceeding for prices substantially below the price placed upon it by the Debtor's expert. Generally, a landowner's offer to sell his land for a certain price has been considered an admission of the value of his land if the proposed offer was freely and openly made and not made under circumstances of economic duress. *Maxey v. Texas Commerce Bank of Lubbock,* 571 S.W.2d 39, 46 (Tex. Civ. App.-Amarillo 1978, writ ref'd n.r.e.); *Gulf, Colorado and Santa Fe Railway Company v. Hanks,* 308 S.W.2d 165, 168 (Tex. Civ. App.-Ft. Worth 1957), *rev'd. on other grounds*, 159 Tex. 311, 320 S.W.2d 333, (1959)("According to a substantial amount of authority, where the landowner who made the offer is a party to the action in which the market value of his real property is in question, the fact that he is offered to sell such party for a certain amount, or has listed it for sale with an agent or broker at a designated listing or asking price, or has granted a third person an option to purchase it at a given price, is generally admissible and evidence

against the landowner as constituting and admission against interest which bears upon the market value of such real property, at least where the offer or option is not too remote in point of time.") The offers to sell made by the Debtor in 2012 and 2013 were not under duress as neither BBVA Compass Bank or Pineda had not sought to foreclose on the property.

## CONCLUSION

Pineda prays that this Honorable Court value the Debtor's property in accordance with the evidence presented at the confirmation hearing, finding that the fair market value is below Pineda's secured claim, rendering the Debtor's plan infeasible and not in accordance with the requirements of §1129(b) of the code.  Pineda requests that this Honorable Court sustain its objection to the plan, granting Pineda's Motion to Lift Stay and allowing it to exercise its right to foreclose on the hospital and on its cash.

Respectfully submitted:

SCHAUER & SIMANK, P.C.
615 North Upper Broadway, Suite 700
Corpus Christi, Texas  78401-0781
Telephone:  361-884-2800
Facsimile:   361-884-2822


By:  /s/*Ronald A. Simank*
     Ronald A. Simank
     State Bar No. 18359400
     Federal Admission No. 0359

**ATTORNEYS FOR
PINEDA GRANTOR TRUST II**

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of April, 2014, a true and correct copy of the foregoing instrument was sent via electronic mail to all counsel and parties listed on the Court's ECF filing system and deposited in the United States mail, first class postage prepaid to the following:

Brownsville MD Ventures, Inc.
c/o Chester R. Gonzalez
117 East Price Road
Brownsville, TX  78521

Kell Corrigan Mercer
Husch Blackwell LLP
111 Congress Ave., Suite 1400
Austin, TX  78701

U.S. Trustee
Barbara C. Jue
606 N. Carancahua, Suite 1107
Corpus Christi, TX  78401

Shelby A. Jordan
Jordan, Hyden, Womble
Culbreth & Holzer, PC
500 North Shoreline, Suite 900N
Corpus Christi, TX  78401

Vicki M. Skaggs
Atlas & Hall
818 Pecan
P.O. Box 3725
McAllen, TX  78502-3725

William C. Romo
Chapter 7 Trustee
400 N. McColl, Suite E
McAllen, TX  78501

Richard S. Hoffman
5337 Padre Island Hwy.
Brownsville, TX  78521

Cary M. Toland 855 E. Harrison
855 E. Harrison
Brownsville, TX  78520

Gilbert L. Hamberg
1038 Darby Drive
Yardley, PA  19067

Diane Wade Sanders
Linebarger Goggan Blair &
Sampson, LLP
2700 Via Fortuna, Suite 400
Austin, TX  78746

Mark Alan Twenhafel
Walker & Twenhafel, LLP
2424 North 10th Street
Suite 200
McAllen, TX  78502-3766

*/s/ Ronald A. Simank*
Ronald A. Simank